T.C. Memo. 2009-288


UNITED STATES TAX COURT


PALM CANYON X INVESTMENTS, LLC, AH INVESTMENT HOLDINGS, INC., TAX
MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 5610-06.                    Filed December 15, 2009.


        PC, a single-member LLC owned by AHI, entered into
offsetting market-linked deposit contracts with SG.
Each contract provided for potential premium interest
on the deposit; the terms of the potential premium
interest in each contract constituted a European-style
foreign currency digital option.  Shortly thereafter,
CFA became a member in PC.  As a result, PC was
classified as a partnership for tax purposes, and the
offsetting MLD options were treated as contributions to
the newly formed partnership.  AHI claimed a basis in
its PC partnership interest that included the premium
it owed for the long MLD option, but AHI did not reduce
its partnership basis to account for any obligation
under the short MLD option under sec. 752(b), I.R.C.
Less than 2 months later, AHI acquired CFA's PC
membership interest and again became PC's only member,
causing liquidation of the PC partnership.  Under sec.
732(b), I.R.C., in the only asset deemed distributed by
PC, a foreign currency position in Canadian dollars,

AHI claimed a basis that equaled AHI's basis in its PC interest, minus cash it received, as a deemed liquidating distribution. PC then sold the Canadian dollars and claimed a substantial ordinary tax loss. R issued a notice of final partnership administrative adjustment in which he determined that PC was a sham and that the MLD contracts lacked economic substance and should be disregarded. P petitioned this Court under sec. 6226(a), I.R.C.

    Held: The MLD transaction is disregarded under the economic substance doctrine.

    Held, further, the accuracy-related penalty under sec. 6662, I.R.C., applies.

Steven R. Mather and Lydia B. Turanchik, for petitioner.

Stephen M. Barnes, William R. Davis, Jr., Dennis M. Kelly, and David W. Sorensen, for respondent.


CONTENTS

FINDINGS OF FACT.............................................. 6

    I.   Background........................................... 6

    II.  Notice 2000-44...................................... 8

    III. Investigating the MLD Strategy ..................... 9

    IV.  Executing the MLD Transaction...................... 15

        A.    Preliminary Steps............................ 15

        B.    The MLD Contracts............................ 17

        C.    Transactions Following the MLD Contracts ...... 22

        D.    Termination of the MLD Contracts.............. 24

        E.    Activities Following the Termination of the
              MLD Contracts................................. 25

F.    Pryor Cashman Opinion.........................  28

G.    Palm Canyon's Trading Activity After 2001......  29

V.    Relevant Tax Reporting for 2001....................  30

A.    Palm Canyon's Return.........................  30

B.    Thighmaster's Return.........................  31

C.    The Hamels' Return...........................  33

VI.   FPAA.............................................  34

OPINION...................................................  35

I.    Jurisdiction Under TEFRA..........................  35

II.   Statute of Limitations on Assessments..............  37

III.  Burden of Proof...................................  39

IV.   Economic Substance of the MLD Transaction.........  40

A.    Definition of a "Liability" Under Section 752..  43

B.    Section 1.752-6, Income Tax Regs..............  47

C.    Economic Substance Doctrine...................  50

1.    Subjective Prong.........................  55

a.    The Hamel Companies' Lack of a
      Current or Foreseeable Need To Hedge
      Foreign Currencies...................  56

b.    Lack of Investigation Into the
      Foreign Currency Aspects of the MLD
      Contracts and the Participating
      Parties..............................  58

c.    Lack of Rational Economic Behavior in
      Pricing the MLD Contracts...........  59

d.    CF Advisors' Membership in Palm Canyon
      Solely To Facilitate the Tax Benefit
      Contemplated by the MLD Transaction..  62

- 4 -

        e.    The MLD Strategy as a Tax Shelter To
Offset Mr. Hamel's Taxable Income.... 67

    2.    Objective Prong........................... 68

        a.    Palm Canyon's Lack of Realistic
Chance of Hitting the Sweet Spot..... 69

        b.    Nullification of Any Potential Profit
by Palm Canyon's MLD Transaction
Fees................................. 71

  D.    Conclusion.................................... 74

V.    Section 6662 Accuracy-Related Penalty.............. 75

  A.    Preliminary Matters........................... 76

    1.    Jurisdiction.............................. 76

    2.    Burden of Production..................... 78

  B.    Gross Valuation Misstatement.................. 79

  C.    Negligence.................................... 86

  D.    Substantial Understatement.................... 92

  E.    Section 6664(c) Reasonable Cause Exception......99

VI.  Conclusion........................................ 103

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Judge:  Respondent issued a notice of final partnership administrative adjustment (FPAA) for 2001 pursuant to section 6223(a)[1] to AH Investment Holdings, Inc. (AHI), the tax matters partner (TMP) of Palm Canyon X Investments, LLC (Palm

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Canyon),[2] a limited liability company classified as a partnership for Federal income tax purposes.[3]  In the FPAA respondent determined that Palm Canyon was a sham and that offsetting market-linked deposit[4] contracts (MLD contracts) entered into by Palm Canyon lacked economic substance and should be disregarded for Federal income tax purposes.  Accordingly, respondent made adjustments to the income, expense, deduction, and distribution items reported by Palm Canyon on its 2001 Federal income tax return and imposed an accuracy-related penalty under section 6662.  A petition for readjustment of partnership items was filed by AHI on behalf of Palm Canyon.

The parties tried and briefed the following issues:

(1) Whether Palm Canyon's MLD contracts lacked economic substance and should be disregarded for Federal income tax purposes;

(2) alternatively, whether Palm Canyon should be disregarded as a sham;

---

[2]Palm Canyon is subject to the unified partnership audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 402(a), 96 Stat. 648.

[3]Palm Canyon's 2001 partnership tax year began Oct. 19, 2001, and ended Dec. 18, 2001 (Palm Canyon's 2001 tax year).

[4]Hereinafter, we will refer to market-linked deposit(s) as MLD(s).

(3) alternatively, whether Palm Canyon's short MLD contract is a liability under section 752(a) and (b) or a contingent liability under section 1.752-6, Income Tax Regs.;

(4) alternatively, whether the MLD contracts should be treated as a single integrated transaction with a net tax basis of $55,000 under the substance over form doctrine and section 988; and

(5) whether any underpayment of tax attributable to the adjustments to partnership items is subject to the section 6662 accuracy-related penalty, as determined at the partnership level.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of the parties are incorporated herein by this reference. On the date AHI filed its petition as Palm Canyon's TMP, Palm Canyon had no principal place of business, as it had ceased to exist.

I. Background

In 1988 Alan Hamel (Mr. Hamel) and his wife, Suzanne Hamel,[5] (collectively the Hamels) began promoting various retail products, including the well-known "Thighmaster" piece of exercise equipment. The Hamels enjoyed considerable success with the Thighmaster, selling millions of units. By 2001 the Hamels'

---

[5]Suzanne Hamel, also known as Suzanne Somers, is an actress who is featured in advertisements for the "Thighmaster". The parties' stipulations also reflect the spelling "Sommers".

retail operation included numerous products besides the Thighmaster, including other fitness products, jewelry, books, videos, and various food items.  The Hamels' businesses manufactured over 1,000 products annually.

The Hamels operated their retail business through a corporate structure headed by Thighmaster World Corp. (Thighmaster).[6]  As of December 31, 2001, Thighmaster was the parent corporation of seven subsidiary corporations engaged in various business activities and organized by function and product sales[7] (collectively the Hamel companies).  During 2001 Mr. Hamel was Thighmaster's sole shareholder.

Through 2001 none of the Hamel companies operated a business or owned any manufacturing, storage, or sales facilities in a foreign country.  In 2001 the Hamel companies' international activities consisted primarily of sales through the Internet. The Hamel companies also ordered a significant portion of the materials used to make their products from Asia and had some of their products manufactured there.

None of the Hamel companies' businesses had any contracts due in 2001 or 2002 that required payments in foreign currencies.

---

[6]Mr. Hamel organized Thighmaster in 1995.  Sometime after 2001 Thighmaster changed its name to ELO.

[7]As of Dec. 31, 2001, six of the seven corporations were qualified subch. S subsidiary corporations.

Additionally, Thighmaster had no direct or indirect ownership interest in any foreign entity or bank account and paid no foreign taxes.

II.  Notice 2000-44

On August 13, 2000, the Internal Revenue Service (IRS) issued Notice 2000-44, 2000-2 C.B. 255, titled "Tax Avoidance Using Artificially High Basis"; it was published in the Internal Revenue Bulletin on September 5, 2000.  In Notice 2000-44, supra, the IRS addressed arrangements that produce noneconomic tax losses on the disposition of partnership interests and described two variations of loss-generating transactions.  One described transaction involved purchasing and writing options and purportedly creating positive basis in a partnership interest by transferring the options to a partnership.  Id., 2000-2 C.B. at 255.  In such a transaction, the taxpayer purports to have a basis in the partnership interest equal to the cost of the purchased call option, although the net economic outlay and the value of the partnership interest are nominal or zero.  Id.  The taxpayer then claims a tax loss on the disposition of partnership interest without incurring a corresponding economic loss.  Id.  In the notice the IRS stated that losses resulting from the described transaction did not represent bona fide losses reflecting actual economic consequences and were not allowable as deductions for Federal income tax purposes.  Id.

In the notice the IRS also stated that "tax losses from similar transactions designed to produce noneconomic tax losses by artificially overstating basis in corporate stock or other property are not allowable as deductions" and appropriate penalties might be imposed on participants in these transactions. Id. The IRS also stated that transactions that were the same as or substantially similar to the ones described in the notice could be subject to challenge under section 752, under section 1.701-2, Income Tax Regs., or under other antiabuse rules and could result in the imposition of a section 6662 accuracy-related penalty. Id., 2000-2 C.B. at 255-256.

III. Investigating the MLD Strategy

Mr. Hamel's certified public accountant (C.P.A.), Clifton Lamb (Mr. Lamb),[8] was looking for a means to reduce the Hamels' tax liability as early as August 2001 when he met with Aaron Sokol and Steven Fuld of the Skyline Group, a financial services firm, to discuss "high end tax products for big losses". In a telephone conversation on August 17, 2001, Mr. Hamel and Mr. Lamb discussed foreign markets and foreign currencies. Shortly after this conversation, Mr. Lamb met with John Ivsan (Mr. Ivsan), a

---

[8]Mr. Lamb had advised Mr. Hamel on business and tax matters since 1996. Mr. Lamb describes himself as an "outsource CFO" of the Hamel companies. Mr. Lamb worked as a field agent with the IRS for approximately 13 years. During 2001 and part of 2002 Mr. Lamb was a partner in the accounting firm of Miod & Co., LLP During 2002 he was an owner of Lamb Accountancy Corp.

tax attorney with Cantley & Sedacca, LLP (Cantley & Sedacca),[9] to discuss foreign currency trading with MLDs (MLD strategy).[10] Reg Wilson (Mr. Wilson), an employee of EPIC Advisors, Inc. (EPIC), a financial and retirement planning and advisory firm, referred Mr. Lamb to Cantley & Sedacca.[11] Paul Kestenbaum (Mr. Kestenbaum), an attorney who introduced Mr. Lamb to Mr. Wilson, also attended the meeting.[12]

The MLD strategy involved offsetting currency positions that produced a capital or ordinary tax loss by exploiting the provisions governing the tax treatment of partners and partnerships. Mr. Ivsan introduced Cantley & Sedacca to the MLD strategy around April 2001. During 2001 Cantley & Sedacca, with

---

[9]Cantley & Sedacca was a law firm organized in Georgia. Its principal place of business was in Dallas, Tex. The firm was formed on Mar. 7, 2001, and dissolved in late 2002.

[10]MLDs are money market instruments issued by financial institutions whereby an investor deposits money with the financial institution for a fixed period, and in lieu of all or part of the interest to be paid on the deposit, the depositor has the opportunity to earn a higher return than otherwise granted for a traditional time deposit. The higher return depends on the market performance of some other asset specified in the MLD documentation.

[11]EPIC received a flat fee of $137,500 from Cantley & Sedacca for referring Mr. Lamb. Mr. Wilson paid Mr. Lamb $45,833.43 of this amount.

[12]Mr. Wilson also paid $45,833.29 of EPIC's $137,500 referral fee from Cantley & Sedacca to Mr. Kestenbaum and his law firm.

the assistance of Daniel Brooks (Mr. Brooks),[13] a former foreign currency trader at Deutsche Bank AG,[14] and Craig Brubaker (Mr. Brubaker),[15] an employee at the Dallas branch of Deutsche Banc Alex. Brown,[16] marketed the MLD strategy to accountants and financial advisers nationwide and sold it to approximately 150 clients.[17]  Mr. Brooks knew the MLD strategy was a "tax advantage" or "tax motivated" transaction.

Mr. Lamb's initial reaction to the MLD strategy was that the tax benefit was "too good to be true".  On August 23, 2001, Mr. Lamb spoke with Mr. Hamel about the MLD strategy.  Following the discussion, Mr. Lamb reviewed a tax opinion by the law firm Bryan

---

[13]Mr. Brooks has an M.B.A. degree and extensive experience in the financial industry, having worked as a foreign currency trader for several large banks before starting his own currency adviser firm, Clarion Capital, in 2001.

[14]Deutsche Bank AG is an international bank headquartered in Germany, with offices in London and the United States.  Mr. Brooks worked at Deutsche Bank AG from 1999 to 2001.

[15]Mr. Brubaker met Mr. Brooks during Mr. Brooks' employment with Deutsche Bank AG.

[16]Deutsche Banc Alex. Brown is a licensed broker-dealer engaged in the domestic securities brokerage business and is a division of Deutsche Bank Securities, Inc., a wholly owned subsidiary of Deutsche Bank AG.

[17]The specific origin of the MLD strategy is not clear from the record.  However, Beckett Cantley (Mr. Cantley) of Cantley & Sedacca testified that when Mr. Ivsan brought the MLD strategy to Cantley & Sedacca around April 2001, Mr. Brooks and Mr. Brubaker were held out as the originators of the strategy.

Cave, LLP (Bryan Cave), dated August 24, 2001, on the MLD strategy (Bryan Cave opinion).[18]

On September 11, 2001, Mr. Hamel met with Mr. Lamb and Mr. Ivsan to discuss a possible transaction based on the MLD strategy. At the meeting, Mr. Hamel and Mr. Lamb first learned of Mr. Brooks. Under the proposed structure of the MLD transaction, Mr. Brooks would serve as a foreign currency investment adviser on behalf of Mr. Hamel.[19]

After the meeting Mr. Hamel told Mr. Lamb to continue investigating a potential MLD transaction and to instruct Kenneth Barish (Mr. Barish),[20] an attorney with the law firm Kajan, Mather, & Barish, P.C., also to investigate the MLD strategy and analyze the Bryan Cave opinion. Mr. Lamb contacted Mr. Barish about the MLD strategy and faxed Mr. Barish notes regarding his review of a Bryan Cave draft discussion of the section 6662 penalty dated August 24, 2001. Mr. Lamb researched MLDs on the Internet. Mr. Lamb and Mr. Barish also investigated the

---

[18]Cantley & Sedacca hired Bryan Cave to determine whether a transaction incorporating MLDs should be registered as a tax shelter and to evaluate other potential tax issues.

[19]Mr. Brooks served as a foreign currency investment adviser in each of the approximately 150 MLD transactions in which he participated.

[20]Mr. Barish had advised Mr. Hamel on tax matters since the late 1980s. Mr. Barish worked in the Criminal Tax Division of the U.S. Department of Justice and the Tax Division of the U.S. Attorney's Office for the Central District of California before entering private practice. Mr. Barish has experience in litigating tax shelter cases.

backgrounds of Mr. Ivsan and Mr. Brooks. Mr. Lamb conducted Internet research on Mr. Brooks and his currency-adviser firm, Clarion Capital. Mr. Barish confirmed that Mr. Ivsan had received an LL.M. from New York University. Mr. Barish hired a private investigator, Alan Wells (Mr. Wells), to conduct a background check on Mr. Brooks.

On September 12, 2001, Mr. Lamb and Mr. Barish met with Mr. Ivsan to discuss a potential MLD transaction and to give Mr. Barish an opportunity to review the Bryan Cave opinion. After reading the opinion, Mr. Barish was skeptical of the tax benefits of the MLD strategy.

On or around September 13, 2001, Mr. Hamel instructed Mr. Lamb to meet with Mr. Brooks to discuss the MLD strategy. Mr. Lamb exchanged several emails with Mr. Brooks regarding Mr. Brooks' background and a potential MLD transaction. On September 20, 2001, Mr. Wells provided Mr. Barish a report regarding background inquiries on Mr. Brooks. The background check confirmed various aspects of Mr. Brooks' identity. Following the receipt of Mr. Wells' report, Mr. Lamb sought to obtain a credit report on Mr. Brooks. In an email to Mr. Brooks, Mr. Lamb stated that good credit was an indication of business acumen and that the Hamel companies typically examined an individual's credit before going into business with that person. However, Mr. Brooks

did not deem his credit relevant and failed to provide the necessary credit waiver.

On September 26, 2001, Mr. Lamb met with Mr. Brooks to evaluate whether Mr. Brooks was trustworthy. Mr. Lamb also met with Marc Kushner (Mr. Kushner), a tax attorney with the law firm Pryor, Cashman, Sherman & Flynn, LLP (Pryor Cashman). Cantley & Sedacca referred Mr. Hamel to Pryor Cashman. Mr. Ivsan and Mr. Barish participated by telephone in the meeting with Mr. Kushner. Mr. Ivsan also gave Mr. Barish and Mr. Lamb a copy of a discussion of the section 6662 penalty contained in a Pryor Cashman draft tax opinion on the MLD strategy.

Following the meetings with Mr. Brooks and Mr. Kushner, Mr. Lamb recommended that Mr. Hamel proceed with the proposed MLD transaction. Mr. Barish noted that the MLD strategy represented an "aggressive tax opinion" that worked "from a technical standpoint", and he recommended creating a paper trail memorializing discussions concerning offshore expansion and currency transactions before executing the MLD strategy. On October 4, 2001, Thighmaster held a management meeting for which Herb Schmidt, Thighmaster's chief financial officer (CFO) and director of operations, prepared a memorandum regarding "Business Opportunity/Business Plan" and Jim England, Thighmaster's president, prepared a memorandum regarding "International Marketing". The memoranda recommended expanding the Hamel

companies' business operations into foreign markets and outlined potential strategies.[21]  Around this time, Mr. Hamel decided to proceed with executing the MLD transaction.

IV.  Executing the MLD Transaction

A.   Preliminary Steps

On October 9, 2001, Mr. Hamel and Cantley & Sedacca executed an agreement for legal services.  That same day, Mr. Lamb, as trustee of the Galway Trust,[22] made a $325,000 wire transfer from the Galway Trust's account to Cantley & Sedacca for services related to the MLD strategy that were rendered by various parties.[23]

Sometime before October 9, 2001, Cantley & Sedacca sent Mr. Lamb documents regarding the MLD transaction for Mr. Hamel to sign and return to the firm.  Those documents related to and purported to implement the MLD transaction and included formation documents for Palm Canyon and AHI, an operating agreement effectively making Mr. Brooks (through CF Advisors, XL, LLC, an

---

[21]The only recommendation contained in the memoranda that the Hamel companies implemented in 2001 was a recommendation in Mr. Schmidt's memorandum related to measures designed to guard against foreign currency fluctuations.

[22]The parties stipulated that "Galway Trust was owned by Alan and Suzanne Hamel".

[23]The $325,000 fee was nonrefundable provided that Pryor Cashman issued a tax opinion with respect to the MLD transaction before Apr. 15, 2002.  From the $325,000 payment, Cantley & Sedacca distributed $50,000 to Pryor Cashman for its tax opinion and $137,500 to EPIC as a referral fee.

entity created by Mr. Brooks under Clarion Capital (CF Advisors), see infra p. 22) a member of Palm Canyon, and various operational documents with banks involved in the MLD transaction. The documents also included notice, agreement, and payment documents related to buying out Mr. Brooks' Palm Canyon interest (through CF Advisors, see infra pp. 26-27) (which did not occur until December 18, 2001), and a letter authorizing the sale of all positions held by Palm Canyon (which did not occur until December 27, 2001). On or around October 9, 2001, Mr. Hamel signed but did not date those documents.

On October 10, 2001, AHI was incorporated under the laws of Delaware.[24] Mr. Hamel received 1,000 common shares of AHI as the company's sole shareholder.

On October 10, 2001, Palm Canyon was formed as a limited liability company under the laws of Delaware. On or around October 11, 2001, Palm Canyon established a brokerage account with Deutsche Banc Alex. Brown,[25] and Mr. Lamb, as trustee of the Galway Trust, transferred $825,000 to this account.[26] On October 11, 2001, Mr. Hamel executed an operating agreement for Palm

---

[24]Cantley & Sedacca prepared all documents related to the formation and organization of AHI and Palm Canyon and filed the formation or incorporation documents with the applicable government agencies.

[25]Palm Canyon did not have a financial or bank account with any other financial institutions or broker-dealers during 2001.

[26]Mr. Brubaker handled all transactions related to Palm Canyon's Deutsche Banc Alex. Brown account.

Canyon, effective as of October 9, 2001, naming himself the sole member and acknowledging his capital contribution of $825,000 in exchange for 100,000 class A units.[27]  Mr. Hamel also signed a Form SS-4, Application for Employer Identification Number, dated October 11, 2001, identifying Palm Canyon as a multiple-member limited liability company and checking the "Partnership" box.

Mr. Hamel also executed a "Full Trading Authorization with Privilege to Withdraw Money and/or Securities" with Deutsche Banc Alex. Brown, dated October 11, 2001, authorizing Mr. Brooks to act on behalf of Palm Canyon with respect to its Deutsche Banc Alex. Brown account.  On or around October 15, 2001, Mr. Hamel and CF Advisors entered into an agreement for services related to foreign currency investments.  Under this arrangement, Mr. Hamel purportedly authorized Mr. Brooks to select which foreign currency trades to make on behalf of Palm Canyon within certain risk parameters that Cantley & Sedacca had set.

B.    The MLD Contracts

On October 15, 2001, Palm Canyon entered into MLD contracts; it executed the trades that were part of the MLD strategy and received two trade confirmations from Société Générale,[28] each

---

[27]As a limited liability company with only one member, Palm Canyon was disregarded as an entity separate from its owner for Federal income tax purposes, absent an election to be classified as a corporation.  Secs. 301.7701-2(a) and (b), 301.7701-3(a) and (b)(1), Proced. & Admin. Regs.

[28]Société Générale is an international bank headquartered in
(continued...)

identified as a currency linked deposit swap.  The MLD contracts provided for offsetting deposits between Palm Canyon and Société Générale to be made on October 16, 2001, in the amounts of €54,945,050, or $50 million using the spot exchange rate of 0.9100 U.S. dollar per euro.[29]  The MLD contracts required Palm Canyon and Société Générale to repay the deposits on December 18, 2001, in U.S. dollars, together with a fixed yield on the deposit amount computed at an annual rate of 3.665 percent ($300,326).

The MLD contracts provided for a potential premium interest payment on the deposit that was structured as a European-style, foreign currency digital option.[30]  Ostensibly, Mr. Brooks made the foreign currency trades on the bet that the U.S. dollar would strengthen against the Japanese yen.

One MLD contract included a call option on Japanese yen purchased by Palm Canyon from Société Générale (long MLD

---

[28](...continued)
Paris, France, with offices in the United States.

[29]All of the amounts referenced in the MLD contracts were denominated in euro.  For purposes of this opinion, we substitute U.S. dollars for euro using the Oct. 16, 2001, exchange rate of 0.9100 U.S. dollar per euro, consistent with the rate used in the MLD contracts.

[30]An option is a contract that gives the buyer of the option the right, but not the obligation, to buy or sell an asset at a predetermined price (strike price) at some time in the future. The right to buy in the future is a call option, and the right to sell is a put option.  A European-style option cannot be exercised before its expiration date.  A digital option has a fixed payout amount or no payout, depending on whether the price of the underlying asset is above or below the strike price.

option).[31]  The long MLD option required Palm Canyon to pay
Société Générale a $5 million premium on October 16, 2001.[32]
The long MLD option also required Société Générale to pay Palm
Canyon a fixed $8 million premium interest payment, payable on
December 18, 2001, if the Japanese yen to U.S. dollar exchange
rate on December 14, 2001 (spot market exchange rate), as
determined by Société Générale,[33] were equal to or greater than
124.65.  If the spot market exchange rate were less than 124.65
Japanese yen to a U.S. dollar, no premium interest was due.

The other MLD contract included a call option on Japanese
yen sold by Palm Canyon to Société Générale (short MLD option).[34]
The short MLD option required Société Générale to pay Palm Canyon

---

[31]The party purchasing an option is in the "long" position
with respect to that option.

[32]The purchaser of an option pays a premium for its
position, which amount represents the option's value on the
transaction date.

[33]Société Générale was the calculation agent for both MLD
contracts, giving the bank the exclusive right to select the spot
market exchange rate that would apply to the options.  During
2001 the accepted industry practice for a calculation agent
determining a spot market exchange rate under an option contract
was to contact three or four banks on the determination date to
request a spot price of the currency under the contract.  The
calculation agent would ask each bank for both a bid and an ask
price, the prices at which the bank would buy and sell the
currency, respectively.  The bid-ask spread is generally 3 to 5
"pips" (a pip is the smallest price interval normally used in
pricing currencies; for Japanese yen per U.S. dollar quotations a
pip is .01).  The calculation agent could choose any of those
prices as the spot market exchange rate.

[34]The party selling the option is in the "short" position
with respect to that option.

a $4,945,000 premium on October 16, 2001. The short MLD option also required Palm Canyon to pay Société Générale a fixed $7,912,000 premium interest payment, payable on December 18, 2001, if the spot market exchange rate, as determined by Société Générale, were equal to or greater than 124.67 Japanese yen to a U.S. dollar. If the spot market exchange rate were less than 124.67 Japanese yen to a U.S. dollar, no premium interest was due.

The terms of the MLD contracts are summarized as follows:

|  | Long MLD option | Short MLD option |
| --- | --- | --- |
| Deposit | $50,000,000 | $50,000,000 |
| Fixed yield (3.665 percent) | 300,326 | 300,326 |
| Premium payment | 5,000,000 | 4,945,000 |
| Potential premium interest payment | 8,000,000 | 7,912,000 |

On the basis of the offsetting positions of the long and short MLD options, three possible outcomes existed with respect to the premium interest provisions of the MLD contracts. First, if the spot market exchange rate were below 124.65 Japanese yen to a U.S. dollar, both the long and short MLD options would be "out-of-the-money", and neither Palm Canyon nor Société Générale would receive a premium interest payout under the respective MLD contract. Second, if the spot market exchange rate were at or above 124.67 Japanese yen to a U.S. dollar, the long and short MLD options would be "in-the-money", and both Palm Canyon and Société Générale would receive a premium interest payout under

the respective MLD contract.  In this circumstance, Palm Canyon would receive a net premium interest payment of $88,000, the difference between Société Générale's $8 million premium interest payment to Palm Canyon and Palm Canyon's $7,912,000 premium interest payment to Société Générale.  Third, if the spot market exchange rate were 124.65 or 124.66 Japanese yen to a U.S. dollar, the MLD options would be in the "sweet spot", and Palm Canyon would receive a premium interest payout of $8 million under the long MLD option while not owing a premium interest payout to Société Générale under the short MLD option.  Under no circumstances would Palm Canyon owe premium interest to Société Générale under the short MLD option without receiving a premium interest payout from Société Générale under the long MLD option.

Neither Palm Canyon nor Société Générale transferred funds with respect to the $50 million offsetting deposits on October 16, 2001.  Additionally, neither party transferred funds equivalent to the full option premiums required under the MLD contracts; instead, on October 16, 2001, Palm Canyon paid Société Générale a $55,000 net premium, the difference between the $5 million long MLD option premium Palm Canyon owed to Société Générale and the $4,945,000 short MLD option premium Société Générale owed to Palm Canyon.[35]

---

[35]Of the $55,000 net premium, Société Générale retained $12,500, paid Deutsche Banc Alex. Brown $20,500, and distributed $22,000 to "Risk".

C.    Transactions Following the MLD Contracts

As of October 17, 2001, Mr. Hamel assigned AHI his 100,000 class A units in Palm Canyon in exchange for 1,000 AHI shares, making AHI the sole member of Palm Canyon.  Mr. Hamel appointed himself as AHI's sole director, president, and treasurer-secretary.

Also, as of October 17, 2001, Mr. Hamel transferred his 1,000 AHI shares to Thighmaster as a capital contribution, making Thighmaster AHI's sole shareholder.  Thighmaster approved and authorized the capital contribution of Mr. Hamel's AHI shares, accepted AHI as a qualified subchapter S subsidiary, and ratified all prior actions by AHI's directors and officers, including Mr. Hamel.

By an amended operating agreement dated October 19, 2001, AHI and CF Advisors made CF Advisors a member of Palm Canyon.[36] The amended Palm Canyon operating agreement reduced AHI's ownership interest in Palm Canyon to 99,000 class A units and stated that CF Advisors contributed $5,000 to be paid out of investment adviser fees in exchange for 1,000 class B units.  The operating agreement also provided that CF Advisors would receive

---

[36]Mr. Brooks also became a partner or member of the partnership or limited liability company in each of the approximately 150 MLD transactions in which he participated.

a quarterly investment advisory fee and a one-time, fixed $20,000 fee specifically for 2001.[37]

When CF Advisors became a member in Palm Canyon, Palm Canyon became classified as a partnership for Federal income tax purposes.[38] Accordingly, AHI, which until then had been the sole member of Palm Canyon, was treated under section 721 as contributing all of the assets of the limited liability company, which on the date of the contribution consisted of $825,000 and the long MLD option, to the new partnership in exchange for a partnership interest.[39] Under section 722, AHI's basis in its Palm Canyon partnership interest equaled its basis in the assets that it was deemed to contribute to the newly created partnership.[40] Consequently, AHI claimed an initial $5,825,000 basis in its Palm Canyon partnership interest, which included the original $825,000 contributed by Mr. Hamel and the $5 million premium Palm Canyon purportedly paid under the long MLD option.

---

[37]On Oct. 23, 2001, Palm Canyon paid CF Advisors $15,000 of the $20,000 investment adviser fee owed.

[38]When a limited liability company acquires two or more members, it becomes classified as a partnership for Federal income tax purposes, absent an election to be treated as a corporation. Sec. 301.7701-3(a) and (b), Proced. & Admin. Regs.

[39]CF Advisors' $5,000 contribution to be paid out of investment adviser fees was treated as a contribution to the new partnership in exchange for an ownership interest in Palm Canyon.

[40]CF Advisors' basis in its Palm Canyon partnership interest equaled the $5,000 it contributed to the partnership, to be paid out of the investment adviser fee it was due.

AHI did not account for any potential liability with respect to the short MLD option under section 752(b).[41]  AHI's $5,825,000 basis in its Palm Canyon partnership interest was significantly higher than its net economic outlay in acquiring the partnership interest, which was $825,000 and the $55,000 net premium Palm Canyon paid with respect to the MLD options.

Between October 22 and November 21, 2001, Palm Canyon entered into four separate 30-day foreign currency option agreements with Deutsche Bank AG involving Swiss francs, Japanese yen, British pounds, and Canadian dollars.[42]  Each contract required a $5,000 premium payment, which Palm Canyon transferred to Deutsche Bank AG.  Palm Canyon earned a $2,076 net profit on the four options.

D.   Termination of the MLD Contracts

As of December 7, 2001 (termination date), Palm Canyon and Société Générale terminated the MLD contracts,[43] providing for a full release of all respective obligations stated in the

---

[41]Under sec. 752(b), any decrease in a partner's share of the partnership's liabilities, or any decrease in a partner's individual liabilities through the assumption by the partnership of the partner's liabilities, is treated as a distribution of money to the partner by the partnership.  Under sec. 733, a partner's basis in his partnership interest is reduced by the amount of any money distributed to the partner.

[42]Mr. Brooks placed similar minor foreign currency trades for each of his 150 MLD strategy clients.

[43]Neither party raised an issue regarding the Federal income tax consequences of the early termination of the MLD contracts.

confirmations and for a termination payment of $61,600 by Société Générale to Palm Canyon.[44]  On December 7, 2001, the Japanese yen to U.S. dollar exchange rate reported by the New York Federal Reserve Bank was 125.62, putting both the MLD short and long options in the money.  Because of the early termination of the MLD contracts, Palm Canyon earned $6,600 on the MLD contracts, the difference between the $61,600 termination payment and the $55,000 net premium paid to Société Générale, before taking into account the $345,000 in fees paid to Cantley & Sedacca and CF Advisors.

Neither Palm Canyon nor Société Générale transferred $50 million on the termination date, or at any time thereafter, to repay the offsetting deposits.  Similarly, neither party paid the fixed yield to its counterparty.

E.    Activities Following the Termination of the MLD Contracts

On December 14, 2001, Palm Canyon purchased Canadian dollars at a conversion rate of 0.67226440 Canadian dollar per U.S. dollar for $1,000 (Canadian dollars position).[45]

---

[44]The termination payment represented the premium Société Générale was willing to pay Palm Canyon to cancel the MLD contracts.

[45]Mr. Brooks bought Canadian currency in many of the other MLD transactions in which he participated.  In the instances where he did not purchase Canadian currency, Mr. Brooks purchased equity interests, presumably so the character of the loss on the disposition of the equity interest would be capital instead of ordinary.

Both Mr. Lamb and Mr. Barish knew that AHI had to acquire CF Advisors' membership interest in Palm Canyon before the end of Thighmaster's 2001 tax year to recognize the MLD strategy's tax benefit.[46]  As of December 18, 2001, AHI purchased CF Advisors' 1,000 class B units in Palm Canyon for $5,000.[47]  Because of AHI's acquisition of CF Advisors' membership units, AHI became again the sole member of Palm Canyon.[48]  Consequently, under section 708(b)(1), Palm Canyon's partnership status was terminated, triggering a deemed distribution of Palm Canyon's assets.  See Rev. Rul. 99-6, 1999-1 C.B. 432.  On December 18, 2001, Palm Canyon's only assets were $820,522 and the Canadian dollars position.  Mr. Hamel, on behalf of AHI, transferred $5,000 to CF Advisors in payment for its membership units, and the remaining $815,522 and the Canadian dollars position were deemed distributed to AHI.  Under section 732(b),[49] AHI claimed a

---

[46]Mr. Brooks terminated his partnership or membership interest before Dec. 31, 2001, in all of the approximately 150 MLD transactions he entered into in 2001.

[47]AHI bought out CF Advisors' Palm Canyon interest without any negotiation, paying $5,000, the same amount as CF Advisors' original contribution.  Mr. Brooks was bought out without any negotiation in each of the 150 MLD transactions in which he participated in 2001.

[48]Palm Canyon again became a single-member limited liability company, causing it to be disregarded as an entity separate from its owner for Federal income tax purposes, absent an election to be classified as a corporation.  Secs. 301.7701-2(a) and (b), 301.7701-3(a) and (b)(1), Proced. & Admin. Regs.

[49]Under sec. 732(b), the basis of property (other than
(continued...)

$5,001,000 basis in the Canadian dollars position, which equaled AHI's adjusted basis in its Palm Canyon partnership interest, minus the cash it received in the liquidating distribution. See infra p. 31.

By letter dated December 18, 2001, Mr. Hamel informed Mr. Brubaker of CF Advisors' sale of its interest in Palm Canyon to AHI and indicated that Mr. Brooks no longer had investment authority over Palm Canyon's Deutsche Banc Alex. Brown account. As discussed above, see supra pp. 15-16, on or around October 9, 2001, Mr. Hamel had signed but had not dated the agreement, payment, and notice documents relating to CF Advisors' sale of its Palm Canyon partnership interest. The December 18, 2001, dates on these documents were not in Mr. Hamel's handwriting.[50]

After 2001 Mr. Brooks had no involvement with any of the Hamel companies. Mr. Lamb turned over the Hamel companies' foreign currency trading activities to Mr. Brubaker and Todd Clendenning at Deutsche Bank Alex. Brown.

By letter dated December 24, 2001, Mr. Hamel authorized Mr. Brubaker to sell Palm Canyon's Canadian dollar position. Mr. Hamel had signed the letter on or around October 9, 2001, but had

[49](...continued)
money) distributed by a partnership to a partner in liquidation of the partner's interest equals the partner's adjusted basis in the partnership, reduced by any money distributed in the same transaction.

[50]The record does not indicate who dated the Dec. 18, 2001, letter or when it was dated.

not dated it at that time.[51]  On December 27, 2001, pursuant to the December 24, 2001, letter that Mr. Hamel had signed in October 2001, the Canadian dollars position was sold at a conversion rate of 0.59029500 Canadian dollar to a U.S. dollar for $878.07.  Thighmaster claimed an ordinary tax loss of $5,001,000 as a result of the disposition of the Canadian dollars position.[52]  See infra p. 32.

As of December 31, 2001, Mr. Lamb became a director and the treasurer/CFO and secretary of AHI.

F.   Pryor Cashman Opinion

On or around February 7, 2002, Mr. Hamel engaged Pryor Cashman to issue a tax opinion with respect to the MLD transaction.[53]  Cantley & Sedacca provided Pryor Cashman with documents relating to the MLD transaction for Pryor Cashman to use in the preparation of its tax opinion.  On February 13, 2002, Mr. Kushner mailed Mr. Lamb a copy of Pryor Cashman's opinion letter (Pryor Cashman opinion) regarding the MLD transaction.  A

---

[51]The handwriting dating the letter Dec. 24, 2001, was not Mr. Hamel's.  The letter resulted in the sale of Palm Canyon's Canadian dollars position, which was purchased on Dec. 14, 2001, for $1,000 and which had been deemed distributed to AHI on Dec. 18, 2001.

[52]The disposition of the Canadian dollars position was a foreign currency transaction that resulted in an ordinary loss. See sec. 988(a)(1)(A), (b)(2), and (c)(1); sec. 1.988-1(a)(1), Income Tax Regs.

[53]During 2001 and 2002 Pryor Cashman prepared between 40 and 50 tax opinions relating to the MLD strategy.

letter attached to the Pryor Cashman opinion stated that the opinion could not be relied on until Mr. Hamel and Mr. Brooks signed and returned a series of representations on which Pryor Cashman relied in issuing its tax opinion.  One of the representations included a statement by Mr. Hamel that he entered into the MLD transaction for business reasons with the intent to make a profit.  Mr. Brooks provided his representations to Pryor Cashman, but Mr. Hamel did not.

In anticipation of receiving the representations of Mr. Hamel and Mr. Brooks, Pryor Cashman issued an opinion concluding that Palm Canyon's tax treatment of the MLD transaction would "more likely than not" be respected.  However, because Mr. Hamel never supplied the requested representations, neither Palm Canyon nor Mr. Hamel was entitled to rely on the Pryor Cashman opinion by reason of its terms, which were never satisfied. Nevertheless, after reviewing the Pryor Cashman opinion, Mr. Lamb and Mr. Barish gave Mr. Hamel a favorable recommendation regarding the MLD transaction.

G.   Palm Canyon's Trading Activity After 2001

In 2002 Palm Canyon continued to make foreign currency trades with Deutsche Bank AG, but at a reduced level.  In 2002 Palm Canyon entered into three foreign currency investment contracts and earned a total profit of $70,403.  In 2003 the Hamel companies stopped making foreign currency trades.  On June

1, 2005, Palm Canyon's status as a limited liability company under the laws of Delaware was canceled.

## V.   Relevant Tax Reporting for 2001

### A.   Palm Canyon's Return

On July 19, 2002, Palm Canyon filed a Form 1065, U.S. Return of Partnership Income, for 2001 (Palm Canyon's return).[54]  Palm Canyon's return reported the following items for AHI and CF Advisors:

|  | AHI | CF Advisors |
|---|---|---|
| Capital contributions | $5,825,000 | $5,000 |
| Share of income/expenses | (8,478) | -0- |
| Guaranteed payments | -0- | 20,000 |
| Distributions | 5,816,522 | 5,000 |
| Ending capital account | -0- | -0- |

The $5,825,000 in capital contributions from AHI that Palm Canyon reported on its return consisted of Mr. Hamel's $825,000 and the $5 million premium Palm Canyon purportedly paid to Société Générale.

The net amount of Palm Canyon's separately stated partnership items was ($8,478), all of which Palm Canyon allocated to AHI.[55]  This amount included, among other items of

---

[54]On the recommendation of Mr. Ivsan, Robert Kipp, a partner in the Tax Practice Group of BDA&K Business Services, Inc., an accounting and tax preparation service located in Dallas, Tex., prepared Palm Canyon's return.

[55]Palm Canyon's return reported the following separately stated partnership items:

(continued...)

income and expenses, $900,326 of interest income purportedly attributable to the long MLD option and $893,726 of interest expense purportedly attributable to the short MLD option.

The $5,816,522 distribution to AHI reported on Palm Canyon's return resulted from the liquidation of the Palm Canyon partnership for Federal income tax purposes on December 18, 2001. AHI claimed a $5,816,522 adjusted basis in its Palm Canyon partnership interest at the end of Palm Canyon's 2001 tax year.[56] AHI received $815,522 in the deemed distribution, and under section 732(b), it allocated its remaining basis in its Palm Canyon partnership interest to the Canadian dollars position, giving AHI a $5,001,000 adjusted basis in the Canadian dollars position.  See Rev. Rul. 99-6, supra.

B.   Thighmaster's Return

For 2001 Thighmaster was an S corporation for Federal income tax purposes and the parent of a group of wholly owned subsidiary

---

[55](...continued)

| Item | Amount |
|------|--------|
| Interest income | $900,326 |
| Interest expense | (893,726) |
| Dividend income | 3,004 |
| Net gain on Deutsche Bank options | 2,076 |
| Guaranteed payment to CF Advisors | (20,000) |
| Wire fees | (50) |
| Nondeductible expenses | (108) |
| Total | (8,478) |

[56]AHI's $5,816,522 basis in its Palm Canyon partnership interest at the end of the partnership's 2001 tax year represented AHI's $5,825,000 initial partnership interest basis minus its share of separately stated partnership items ($8,478).

corporations that filed a consolidated Form 1120S, U.S. Income Tax Return for an S Corporation (Thighmaster's return).[57] Thighmaster included AHI on its return as a qualified subchapter S subsidiary.[58]

On its return, Thighmaster reported the following items for AHI: (1) Each of the separately stated items of income and deductions from Palm Canyon (net amount of negative $8,478); (2) $878 of additional interest income; and (3) $5,001,000 in "Other deductions" for "loss on currency trading". The additional interest income and other deductions for loss on currency trading represented Thighmaster's tax reporting of AHI's December 27, 2001, sale of the Palm Canyon Canadian dollars position for $878.07. Although the sale of the Canadian dollars position resulted in an economic loss of only $121.93 ($1,000 - $878.07), Thighmaster claimed a $5,001,000 ordinary tax loss on the sale because AHI allegedly had acquired a $5,001,000 adjusted basis in the Canadian dollars position from the December 18, 2001, liquidation of the Palm Canyon partnership.[59] Sec. 732(b).

---

[57]Mr. Lamb prepared Thighmaster's 2001 Form 1120S.

[58]By letter dated Dec. 31, 2001, the IRS notified Thighmaster that it approved the qualified subch. S subsidiary election for AHI and terminated AHI's subch. S status.

[59]It is not clear why Thighmaster calculated the loss on the sale of the Canadian currency position without regard to the $878 proceeds of sale.

On its 2001 return, Thighmaster combined AHI's 2001 separately stated items of income and deductions distributed from Palm Canyon with other separately stated items of income and deductions of Thighmaster and its subsidiaries for 2001, resulting in negative $18,431 of consolidated separately stated items of income and deductions for 2001, all of which Thighmaster allocated to Mr. Hamel, the sole shareholder of Thighmaster. Thighmaster also combined AHI's "Other deductions" of $5,001,000 with the income and expenses of Thighmaster and its other subsidiaries for 2001, resulting in a consolidated ordinary loss of $1,921,579 for 2001, all of which Thighmaster allocated to Mr. Hamel.

C.    The Hamels' Return

On October 7, 2002, the Hamels filed a joint Form 1040, U.S. Individual Income Tax Return, for 2001, which showed Mr. Hamel's distributive share of Thighmaster's 2001 separately stated items of income and deductions (net loss of $18,431) and Thighmaster's 2001 ordinary loss of $1,921,579.  The Hamels reported zero taxable income on their return and no 2001 Federal income tax liability.  Excluding the items allocated to Mr. Hamel for 2001 from Palm Canyon and the MLD transaction, through AHI and Thighmaster, the Hamels would have had taxable income of $3,989,130 and an approximate Federal income tax liability of $1,532,000.

## VI. FPAA

Respondent conducted an examination of Palm Canyon's 2001 tax year.  In March 2005 Palm Canyon entered into an agreement to extend the period of limitations for assessment of tax for 2001 until December 31, 2005.  The Hamels similarly agreed to extend the period of limitations for assessment of tax, including items attributable to partnership items, for 2001 to December 31, 2005.

On December 20, 2005, respondent separately mailed an FPAA to Palm Canyon, its partners, AHI (as TMP), and Thighmaster. Respondent determined that Palm Canyon was a sham and that the MLD transaction lacked economic substance, had no business purpose, and constituted an economic sham.  Respondent disregarded the effects of the MLD transaction and adjusted various partnership items on Palm Canyon's return, most notably disallowing the $5,001,000 section 732(b) distribution that resulted from the liquidation of Palm Canyon.[60]  This adjustment effectively disallowed the resulting $1,921,579 ordinary loss

---

[60]In the FPAA respondent made adjustments to the following items on Palm Canyon's return:

| Item | Reported | Corrected | Adjustment |
|------|----------|-----------|------------|
| Portfolio interest | $900,326 | -0- | $900,326 |
| Portfolio dividends | 3,004 | -0- | 3,004 |
| Other portfolio income | 2,076 | -0- | 2,076 |
| Deductions | 20,050 | -0- | 20,050 |
| Interest expense | 893,726 | -0- | 893,726 |
| Investment income | 903,330 | -0- | 903,330 |
| Investment expenses | 20,050 | -0- | 20,050 |
| Distributions | 5,001,000 | -0- | 5,001,000 |

that the Hamels claimed on their return.  Respondent also determined that the accuracy-related penalty under section 6662 should be imposed.

On March 20, 2006, petitioner timely filed a petition for readjustment of partnership items and penalty under section 6226. Petitioner contends that respondent's proposed adjustments are incorrect, that Palm Canyon correctly reported all items of income, loss, basis, and contributions to capital on its return, and that none of respondent's alternative determinations with respect to the section 6662 penalty are appropriate.  Petitioner also alleges that the statute of limitations on assessments bars respondent's proposed adjustments.

Petitioner's case was tried at a special trial session in Los Angeles, California.  Petitioner called the following witnesses:  Mr. Hamel, Mr. Lamb, Mr. Brooks, Mr. Kushner, and Mr. Barish.  Petitioner did not present any expert testimony. Respondent called the following witnesses:  Mr. Barish, Mr. Cantley, Mr. Wilson, and two expert witnesses, Hendrik Bessembinder (Mr. Bessembinder) and Thomas Murphy (Mr. Murphy).

OPINION

I.  Jurisdiction Under TEFRA

Under the unified partnership audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 402(a), 96 Stat. 648, the tax

treatment of any partnership item, except as otherwise provided in subchapter C, must be determined at the partnership level. Sec. 6221.  Section 6226(a) authorizes a TMP to file a petition for readjustment of partnership items within 90 days after the date on which an FPAA is mailed to the TMP.  In a partnership-level proceeding filed pursuant to section 6226(a), this Court has jurisdiction to review all partnership items for the partnership year to which the FPAA relates and to review the allocation of such items among the partners.  Sec. 6226(f).

Section 6231(a)(3) defines a "partnership item" as:

> any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level.

Section 301.6231(a)(3)-1(a), Proced. & Admin. Regs., contains an extensive list of matters that constitute partnership items, including:  (1) All items of partnership income, gain, loss, deduction, credit, and liabilities, and each partner's share thereof; and (2) partnership contributions and distributions. Sec. 301.6231(a)(3)-1(a)(1)(i), (v), (4), Proced. & Admin. Regs. In Petaluma FX Partners, LLC v. Commissioner, 131 T.C. 84, 97 (2008), we held that the determination whether a partnership is a sham, lacks economic substance, or otherwise should be disregarded for tax purposes is also a partnership item.

A nonpartnership item is an item that is not a partnership item and whose tax treatment is determined at the partner level. Sec. 6231(a)(3) and (4). An affected item is any item to the extent it is affected by a partnership item, the tax treatment of which is determined at a partner-level proceeding after the underlying partnership item(s) is determined at the partnership level.[61] Sec. 6231(a)(5); Jenkins v. Commissioner, 102 T.C. 550, 554 (1994).

## II. Statute of Limitations on Assessments

Section 6229(a) provides that the Commissioner must assess any deficiency attributable to a partnership item within 3 years after the date the partnership tax return was filed or within 3 years after the due date of the partnership tax return (determined without regard to extensions), whichever is later. Under section 6229(b)(1), the 3-year period can be extended with respect to all partners by an agreement entered into by the Secretary and the TMP, or any other person authorized by the partnership in writing to enter into such an agreement, before the expiration of such period. The 3-year period is suspended for at least the 90-day period following the mailing of an FPAA,

---

[61]There are two types of affected items: (1) Computational affected items that follow from the result of a partnership-level proceeding and (2) affected items that may require factual development at the partner level. See N.C.F. Energy Partners v. Commissioner, 89 T.C. 741, 744-745 (1987).

during which an action may be brought under section 6226.[62]  Sec. 6229(d).  Additionally, if a petition is filed challenging the FPAA under section 6226, the period in which an assessment can be made is suspended until the decision of the court becomes final, plus 1 additional year.  Sec. 6229(d).

Petitioner argues that the statute of limitations on assessments bars respondent's proposed adjustments in the FPAA. However, before the expiration of the 3-year period following the filing of Palm Canyon's return, petitioner (through Mr. Barish) entered into an agreement with respondent extending the period of limitations for 2001 until December 31, 2005.  Respondent timely mailed petitioner the FPAA on December 20, 2005,[63] and under section 6229(d), the 3-year period of limitations for assessment was suspended at least for the 90-day period following the mailing of the FPAA.  When petitioner subsequently filed a petition challenging the FPAA under section 6226, the assessment period was further suspended until the decision of this Court becomes final, plus 1 additional year.  Sec. 6229(d). Accordingly, the section 6229(a) period for assessments has not yet expired, and we conclude that respondent is not barred from

---

[62]Under sec. 6226(b), if the TMP does not file a petition within the 90-day period, any notice partner and any 5-percent group may file a petition within 60 days after the close of the 90-day period.

[63]Petitioner concedes that respondent mailed the FPAA within the 3-year assessment period, as extended by the agreement.

assessing any deficiencies in tax relating to adjustments to partnership items on Palm Canyon's return.[64]

III. <u>Burden of Proof</u>

Generally, the burden of proof is on the taxpayer in actions challenging the adjustments to partnership items made by the Commissioner, unless otherwise provided by statute or determined by the Court. Rules 142(a), 240(a). Section 7491(a)(1), however, provides that the burden of proof shall be on the Commissioner if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for any income tax. For section 7491(a)(1) to apply, the taxpayer must also satisfy the limitations contained in section 7491(a)(2). Petitioner does not contend that section 7491(a)(1) applies, nor has it demonstrated that it satisfies the requirements of section 7491(a)(2). Consequently, we hold that petitioner has the burden of proof as to any disputed factual issue. See Rules 142(a), 240(a).

---

[64]Because petitioner commenced a proceeding in this Court under sec. 6226, respondent is restricted from assessing and collecting a deficiency attributable to a partnership item until at least the decision of this Court is final. See sec. 6225(a)(2). In addition, respondent may need to send a deficiency notice with respect to affected items. See sec. 6230(a)(2)(A)(i).

IV. Economic Substance of the MLD Transaction[65]

This case arises from petitioner's participation in a strategy that respondent has characterized as a Son-of-BOSS tax shelter.[66] In its simplest terms, the MLD transaction purports to produce a tax benefit in the form of a substantial loss by manipulating the partnership tax rules and taking advantage of caselaw established in other factual contexts that promoters of the MLD strategy contend excludes contingent liabilities from the definition of a liability under section 752. See Helmer v. Commissioner, T.C. Memo. 1975-160, discussed infra pp. 43-47. An MLD transaction typically involves several steps, and the MLD

_____

[65]The phrase "MLD contracts" refers to the contracts that Palm Canyon entered into with Société Générale. The phrase "MLD transaction" refers to the overall strategy, including the MLD contracts and creation and termination of the Palm Canyon partnership.

[66]A Son-of-BOSS transaction can be summarized as follows:

a variation of a slightly older alleged tax shelter known as BOSS, an acronym for "bond and options sales strategy." There are a number of different types of Son-of-BOSS transactions, but what they all have in common is the transfer of assets encumbered by significant liabilities to a partnership, with the goal of increasing basis in that partnership. The liabilities are usually obligations to buy securities and typically are not completely fixed at the time of transfer. This may let the partnership treat the liabilities as uncertain, which may let the partnership ignore them in computing basis. If so, the result is that the partners will have a basis in the partnership so great as to provide for large--but not out-of-pocket--losses on their individual tax returns. * * *

Kligfeld Holdings v. Commissioner, 128 T.C. 192, 194 (2007).

transaction at issue in this case is no exception.  The MLD

transaction consisted of the following.  First, Palm Canyon

entered into the offsetting MLD contracts, whose terms called for

a $5 million premium payment from Palm Canyon to Société Générale

for the long MLD option and a $4,945,000 premium payment from

Société Générale to Palm Canyon for the short MLD option, but

resulted in only a net premium payment of $55,000 by Palm Canyon.

After Palm Canyon entered into the MLD contracts, CF Advisors

joined AHI as the second member in Palm Canyon, and Palm Canyon

became a partnership for Federal income tax purposes.  On the

formation of the Palm Canyon partnership, AHI was treated as

contributing all of Palm Canyon's existing assets, which included

$825,000 in cash and the long MLD option, to the new partnership

in exchange for a partnership interest.  AHI took an initial

basis of $5,825,000 in its Palm Canyon partnership interest,

which represented $825,000 and the cost of the long MLD option,

the purported $5 million premium payment to Société Générale.

However, because Palm Canyon's liability for the premium interest

payment under the short MLD option purportedly was contingent on

the spot market exchange rate, AHI did not reduce its basis in

its partnership interest under section 752(b) with respect to

Palm Canyon's assumption of the short MLD option.[67]  Therefore,

---

[67]AHI based its position on Helmer v. Commissioner, T.C.
Memo. 1975-160, which AHI contends stands for the proposition
(continued...)

AHI claimed an inflated tax basis in its Palm Canyon partnership interest that reflected a $5 million premium paid for the MLD long option, even though AHI's net economic outlay to acquire the partnership interest and the value of the partnership interest were significantly less. When CF Advisors subsequently sold its Palm Canyon partnership interest to AHI, Palm Canyon's partnership status ceased under section 708(b)(1), triggering a liquidation and a deemed distribution of Palm Canyon's assets. See Rev. Rul. 99-6, supra. In the liquidation, AHI was deemed to receive $815,522 and the Canadian dollars position, Palm Canyon's only asset at the time. Under section 732(b), AHI took a $5,001,000 basis in the Canadian dollars position, which equaled its adjusted basis in its partnership interest minus the $815,522 liquidating distribution. Consequently, on the disposition of the Canadian dollars position AHI claimed that it realized and recognized a $5,001,000 ordinary loss for income tax purposes.

We must decide whether Palm Canyon's MLD transaction should be respected for Federal income tax purposes. First, we address whether Palm Canyon's tax treatment of the MLD transaction fits within the literal meaning of the Code, as interpreted by caselaw at the time. Second, we examine whether the MLD transaction should be disregarded under the economic substance doctrine.

_____

[67](...continued)
that a contingent obligation is not considered a liability for purposes of sec. 752. See infra pp. 43-47.

When considering the MLD transaction, we review the economic substance of the transaction as a whole, including the MLD contracts[68] and the creation and liquidation of the Palm Canyon partnership, that occurred as a result of CF Advisors' transitory membership in Palm Canyon.

A.    Definition of a "Liability" Under Section 752

Under section 752(b), a partnership's assumption of a partner's liability is treated as a distribution of money to the partner by the partnership, which reduces that partner's basis in its partnership interest by the amount of the liability assumed. Sec. 733.  For petitioner to receive the tax benefit from the MLD transaction, the short MLD option must be excluded from the definition of a liability for section 752 purposes so that AHI does not have to reduce its basis in its Palm Canyon partnership interest.

At the time of the MLD transaction, the term "liability", as used in section 752, was not defined in either the Code or the regulations.  However, several courts, including this Court, had held that a contingent obligation is not a liability under section 752.  In Helmer v. Commissioner, T.C. Memo. 1975-160, a partnership granted an option to buy partnership property in exchange for a series of cash premiums from the option holder.

---

[68]Because the deposits and fixed yield provisions of the MLD contracts were offsetting, in our analysis we ignore their effect.

Upon the exercise of the option by the option holder the partnership would have had to reduce the property purchase price by the cash premiums it received.  The partnership, however, was not obligated to return the cash premiums if the purchaser failed to exercise the option.  The partnership argued that the premium payments were partnership liabilities because the partnership would have to credit these payments against the purchase price if the option holder exercised the option.  We held that no liability arose upon receipt of the option premiums because the option agreement "created no liability on the part of the partnership to repay the funds paid nor to perform any services in the future."  In other opinions we have applied similar reasoning and have held that comparable obligations were not liabilities for section 752 purposes.  See LaRue v. Commissioner, 90 T.C. 465, 479-480 (1988) (contingent obligations that were not fixed obligations of the partnership and were not sufficiently determinable in amount were not liabilities for section 752 purposes); Long v. Commissioner, 71 T.C. 1, 7-8 (1978) (contingent or contested items such as creditor's claims were not liabilities for section 752 purposes until they became fixed or liquidated), supplemented by 71 T.C. 724 (1979), affd. in part and remanded on other grounds 660 F.2d 416 (10th Cir. 1981).

On its face, Palm Canyon's liability under the short MLD option was contingent on the spot market exchange rate.  If the

Japanese yen to U.S. dollar exchange rate were equal to or greater than 124.67, Palm Canyon owed a $7,912,000 premium interest payment; if the exchange rate were less than 124.67 Japanese yen to a U.S. dollar, Palm Canyon owed nothing.  Because Palm Canyon's liability under the short MLD option appears on its face to be a contingent obligation, the short MLD option would not qualify as a section 752 liability if the Helmer analysis applies.[69]  If, on the other hand, Palm Canyon's liability under the short MLD option was certain to arise because of the way the entire MLD transaction was structured, then the reasoning of Helmer would not control the case at hand.

Courts that have considered transactions in which partners contributed pairs of options to partnerships have reached inconsistent conclusions.[70]  See, e.g., Maquire Partners-Master

---

[69]As discussed below, in 2003 the Department of the Treasury promulgated proposed regulations that altered the definition of a liability for sec. 752 purposes and explicitly stated that "The definition of a liability contained in these proposed regulations does not follow Helmer v. Commissioner, T.C. Memo. 1975-160." 68 Fed. Reg. 37436 (June 24, 2003).  These regulations were finalized in 2005.  See infra pp. 47-49.  The new definition of liability, however, applies only to liabilities incurred or assumed by a partnership on or after June 24, 2003.  Sec. 1.752-1(a)(4)(iv), Income Tax Regs.

[70]Recent cases addressing the definition of a sec. 752 liability in the context of short sales have been more consistent; courts have held that an obligation to close out a short sale constitutes a liability for sec. 752 purposes although the value of the obligation at the time of its contribution is indeterminable.  See Kornman & Associates, Inc. v. United States, 527 F.3d 443 (5th Cir. 2008) (relying on Rev. Rul. 95-26, 1995-1
(continued...)

Invs., LLC v. United States, 103 AFTR 2d 763 at 775, 2009-1 USTC par. 50,215, at 87,447 (C.D. Cal. 2009) (characterizing a short option as a liability for purposes of section 752 because such characterization is consistent with the economic reality of the partner's contribution); Stobie Creek Invs., LLC v. United States, 82 Fed. Cl. 636, 665-667 (2008) (stating that the legal doctrines delineated in Helmer apply to the short option that was contributed to a partnership along with a long option); Jade Trading, LLC v. United States, 80 Fed. Cl. 11, 44-45 (2007) (concluding that a sold call option contributed to a partnership was not a liability for purposes of section 752). Because

---

[70](...continued)
C.B. 131, and holding that a short sale created a partnership liability within the meaning of sec. 752 because it created an obligation to return the borrowed securities and holding that incurring the liability increased the partnership's basis in its assets by the amount of cash received on the sale of the borrowed securities); Salina Pship. LP v. Commissioner, T.C. Memo. 2000-352 (concluding, on the basis of the plain and ordinary meaning of the term "liability", that the taxpayer had a legally enforceable financial obligation to return the shares it borrowed and close out the short sale). In a typical short sale transaction, the short seller borrows shares from a broker and sells them; the short seller must then buy an equivalent number of the borrowed shares and return them to the broker by a future date. See Zlotnick v. TIE Commcns., 836 F.2d 818, 820 (3d Cir. 1988). The short seller earns a profit on the transaction if the securities decline in value because this allows the short seller to make the covering purchase of the borrowed shares at a lower price than the initial short sale. Id.

The potential liability under the short MLD option is distinguishable from an obligation to close out a short sale because Palm Canyon did not have a fixed, legally enforceable financial obligation to make the premium interest payment when the partnership assumed the short MLD option.

respondent contends that Palm Canyon's liability under the short MLD option was not what it appeared to be and given the parties' arguments regarding the economic substance of the MLD transaction,[71] we must still address and decide whether the MLD transaction had economic substance, regardless of how we decide this issue.  Consequently, we shall assume for purposes of the analysis that AHI did not have to reduce its basis in its partnership interest under section 752(b) as a result of Palm Canyon's assumption of the short MLD option, and we shall evaluate the economic substance of the MLD transaction.

B.    Section 1.752-6, Income Tax Regs.

On June 24, 2003, the Department of the Treasury promulgated section 1.752-6T, Temporary Income Tax Regs., 68 Fed. Reg. 37416 (June 24, 2003), concerning a partnership's assumption of certain partner liabilities.  On May 26, 2005, the temporary regulation

---

[71]We also note that even if we were to conclude that the obligation under the short option were a liability for sec. 752 purposes, sec. 752(a) would allow partners to increase their bases in the partnership interests by their shares of the liability that the partnership has assumed.  See sec. 1.752-2, Income Tax Regs. (addressing partner's share of recourse liabilities); sec. 1.752-3, Income Tax Regs. (addressing partner's share of nonrecourse liabilities).  Notably, application of sec. 1.752-6, Income Tax Regs., would not result in a corresponding increase in the partner's outside basis for the increase in the partner's share of partnership liabilities. See, e.g., Klamath Strategic Inv. Fund, LLC v. United States, 440 F. Supp. 2d 608, 620 n.9 (E.D. Tex. 2006).

became final.  T.D. 9207, 2005-1 C.B. 1344.[72]  Section 1.752-6,

Income Tax Regs., generally provides that if a partnership in a

section 721(a) transaction assumes a liability of a partner, as

defined in section 358(h)(3),[73] that is not treated as a

liability under section 752(a) or (b),[74] then the partner's basis

in the partnership is reduced by the amount of the liability.

This regulation was intended to apply retroactively to

---

[72]The regulations changed the definition of a "liability" for purposes of sec. 752 and also defined the term "obligation". See sec. 1.752-1(a)(4), Income Tax Regs.  Sec. 1.752-1(a)(4)(ii), Income Tax Regs., states that an "obligation" is any fixed or contingent obligation to make payment without regard to whether the obligation is otherwise taken into account under the Internal Revenue Code and lists certain obligations that fit within this definition, including "obligations under derivative financial instruments such as options, forward contracts, futures contracts, and swaps."  An obligation is a liability for sec. 752 purposes if it meets the requirements of sec. 1.752-1(a)(4)(i), Income Tax Regs.  While Palm Canyon's short MLD option likely constitutes an obligation within the new definition in sec. 1.752-1(a)(4), Income Tax Regs., the regulation is inapplicable in this case because it applies only to liabilities incurred or assumed by a partnership on or after June 24, 2003.  Sec. 1.752-1(a)(4)(iv), Income Tax Regs.  The IRS' intended application of sec. 1.752-1(a)(4), Income Tax Regs., contrasts with the retroactive application of sec. 1.752-6, Income Tax Regs., discussed above.

[73]Sec. 358(h)(3) provides that the term "liability" includes any fixed or contingent obligation to make payment, without regard to whether the obligation is otherwise taken into account for purposes of the Code.

[74]Before the 2005 regulations were finalized, the term "liability" was not explicitly defined in sec. 752 or its corresponding regulations.

assumptions of liabilities occurring after October 18, 1999, and before June 24, 2003.[75]  Sec. 1.752-6(d), Income Tax Regs.

Application of section 1.752-6, Income Tax Regs., would force AHI to reduce its basis in its Palm Canyon partnership interest by the amount, on the date of assumption, of Palm Canyon's potential premium interest payment to Société Générale under the short MLD option (but not below the adjusted value of the partnership interest), because the short MLD option would qualify as a contingent section 358(h)(3) liability assumed by Palm Canyon.  This reduction in the basis of AHI's partnership interest would effectively eliminate the tax benefit of the MLD transaction because AHI would have no inflated basis in its Palm Canyon partnership interest to transfer to the Canadian dollars position under section 732(b).

The cases that have dealt with section 1.752-6, Income Tax Regs., have focused on whether the regulation can properly be applied retroactively.  See Cemco Investors, LLC v. United States, 515 F.3d 749, 752 (7th Cir. 2008) (regulation can be applied retroactively); Murfam Farms, LLC v. United States, 88 Fed. Cl. 516 (2009) (regulation cannot be applied retroactively); Maguire Partners-Master Invs., LLC v. United States, 103 AFTR 2d 763, at 776-778, 2009-1 USTC par. 50,215, at 87,448-87,450 (C.D.

---

[75]Obligations assumed on or after June 24, 2003, that are not described in sec. 1.752-1(a)(4)(i), Income Tax Regs., are governed by sec. 1.752-7, Income Tax Regs.

Cal. 2009) (regulation can be applied retroactively); <u>Stobie Creek Invs., LLC v. United States</u>, 82 Fed. Cl. at 667-671 (regulation cannot be applied retroactively); <u>Sala v. United States</u>, 552 F. Supp. 2d 1167 (D. Colo. 2008) (regulation unlawful and cannot be applied retroactively); <u>Klamath Strategic Inv. Fund, LLC v. United States</u>, 440 F. Supp. 2d 608, 625-626 (E.D. Tex. 2006) (retroactivity of regulation is ineffective). Recognizing the uncertain state of the law and in the interests of judicial economy, we shall not enter the fray at this time. Instead, we shall assume that the regulation cannot be applied retroactively and evaluate the economic substance of the MLD transaction. See <u>Klamath Strategic Inv. Fund, LLC v. United States</u>, 568 F.3d 537, 546 (5th Cir. 2009).

C. <u>Economic Substance Doctrine</u>

Respondent argues that, even if petitioner complied with the literal terms of the Code as petitioner contends it did, the MLD options lacked economic substance and the partnership was a sham and should be disregarded.[76]  Petitioner concedes that Palm

---

[76]Respondent also argues that we should disregard Palm Canyon's status as a partnership under the so-called partnership antiabuse regulation, sec. 1.701-2, Income Tax Regs.  Generally, the antiabuse regulation permits the Commissioner to recast partnership transactions that make inappropriate use of the partnership tax rules.  Petitioner contends that the antiabuse regulation is invalid.  Because we decide petitioner's case on other grounds, we need not decide whether the partnership antiabuse regulation is valid or whether it applies to the transaction in this case.

Canyon entered the MLD transaction in part because of its tax benefits. However, petitioner points out that the fact that favorable tax consequences were considered in entering the MLD transaction does not compel disallowing those consequences. See Frank Lyon Co. v. United States, 435 U.S. 561, 580 (1978); see also ASA Investerings Pship. v. Commissioner, 201 F.3d 505, 513 (D.C. Cir. 2000) ("It is uniformly recognized that taxpayers are entitled to structure their transactions in such a way as to minimize tax."), affg. T.C. Memo. 1998-305. Petitioner maintains that all entities and transactions had bona fide economic substance and business purpose and must be recognized for tax purposes. We must analyze the MLD transaction and decide whether the transaction had economic substance.

Under the economic substance doctrine, a court may disregard a transaction for Federal income tax purposes if it finds that the taxpayer did not enter into the transaction for a valid business purpose but rather sought to claim tax benefits not contemplated by a reasonable application of the language and purpose of the Code or its regulations. See, e.g., Horn v. Commissioner, 968 F.2d 1229, 1236 (D.C. Cir. 1992), revg. Fox v. Commissioner, T.C. Memo. 1988-570. The origins of the economic substance doctrine can be traced back to the Supreme Court's decision in Gregory v. Helvering, 293 U.S. 465 (1935). In Gregory, the Court held that a reorganization complying with

formal statutory requirements should be disregarded for tax purposes because the taxpayer's creation and immediate liquidation of a corporation was an impermissible attempt to convert ordinary income into capital gain.  Id. at 467.  The Court recognized the taxpayer's right to minimize taxes through legal means but stated that "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended."  Id. at 469.  The Supreme Court concluded that "The whole undertaking, though conducted according to the terms of [the statute], was in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else."  Id. at 470.

In Frank Lyon Co. v. United States, supra at 583-584, the Supreme Court upheld a sale-leaseback transaction over objections that it lacked economic substance.  In reaching its decision, the Supreme Court explained the circumstances in which a transaction should be respected for tax purposes and upheld the economic substance of the transaction at issue:

> where * * * there is a genuine multiple-party
> transaction with economic substance which is compelled
> or encouraged by business or regulatory realities, is
> imbued with tax-independent considerations, and is not
> shaped solely by tax-avoidance features that have
> meaningless labels attached, the Government should
> honor the allocation of rights and duties effectuated
> by the parties.  * * *  [Id.]

The standard articulated in Frank Lyon Co. has formed the basis for the current application of the economic substance

doctrine. Many courts have interpreted the <u>Frank Lyon Co.</u> language as creating an economic substance doctrine that examines two areas or prongs: (1) Whether the transaction had economic substance beyond tax benefits (objective prong), and (2) whether the taxpayer has shown a nontax business purpose for entering the disputed transaction (subjective prong). See, e.g., <u>ACM Pship. v. Commissioner</u>, 157 F.3d 231, 247-248 (3d Cir. 1998), affg. in part and revg. in part T.C. Memo. 1997-115; <u>Bail Bonds by Marvin Nelson, Inc. v. Commissioner</u>, 820 F.2d 1543, 1549 (9th Cir. 1987), affg. T.C. Memo. 1986-23; <u>Rice's Toyota World, Inc. v. Commissioner</u>, 752 F.2d 89, 91-92 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983).

The Courts of Appeals are split as to the proper articulation of the economic substance doctrine, particularly as to the relative weights given to the objective and subjective prongs in determining whether a transaction should be respected for tax purposes. Some Courts of Appeals have applied an analysis, often referred to as "disjunctive", under which a transaction is respected under the economic substance doctrine if the court finds that the transaction has either a subjective business purpose or objective economic substance. See <u>Horn v. Commissioner</u>, <u>supra</u> at 1236; <u>Rice's Toyota World v. Commissioner</u>, <u>supra</u> at 91-92. Other Courts of Appeals have applied an analysis, often referred to as "conjunctive", where a transaction

will be respected under the economic substance doctrine only if the court finds that the transaction satisfies both the subjective and objective prongs. See <u>Dow Chem. Co. v. United States</u>, 435 F.3d 594, 599 (6th Cir. 2006). A third group of Courts of Appeals has rejected the notion of a "rigid two step analysis" and elected to apply an approach under which the subjective and objective prongs are collapsed into a single inquiry. See <u>Sacks v. Commissioner</u>, 69 F.3d 982, 988 (9th Cir. 1995), revg. T.C. Memo. 1992-596.

For the reasons discussed below, we believe the MLD transaction satisfies neither the subjective prong nor the objective prong of the economic substance doctrine. Because the MLD transaction fails both prongs of the economic substance doctrine, our conclusion regarding the economic substance of the MLD transaction is the same regardless of which analysis or approach is applied.

We conduct our analysis by examining the MLD transaction under both the subjective and objective prongs of the economic substance doctrine. In conducting our analysis, we are mindful that respondent's determinations that the MLD transaction had no economic substance and that the partnership was a sham and should be disregarded are presumed correct, and petitioner has the burden of proving that respondent's determinations are in error.

### 1. Subjective Prong

To satisfy the subjective prong, petitioner must demonstrate that Palm Canyon executed the MLD transaction for a business purpose aside from tax benefits. See, e.g., Horn v. Commissioner, supra at 1237. Petitioner argues that Palm Canyon's primary purpose for entering the MLD contracts was to become familiar with foreign currency hedging opportunities. Mr. Hamel testified that he wanted to pursue foreign investments that would give the Hamel companies the ability to hedge against fluctuations in foreign currencies because he was concerned about the effect such fluctuations could have on potential contracts between the Hamel companies and offshore vendors. Petitioner contends that the Hamel companies anticipated a need for foreign currency hedging if Mr. Hamel decided to expand the companies' business overseas. The MLD transaction, petitioner argues, also allowed the Hamel companies to evaluate the performance of Mr. Brooks and to determine whether to pursue further trading activitites with Mr. Brubaker. Additionally, petitioner asserts that Palm Canyon entered into the MLD contracts to earn a real economic profit and that Palm Canyon did earn a $6,600 profit on the contracts.

A necessary element of the MLD transaction as carried out was adding and then terminating CF Advisors' status as a member of Palm Canyon, the overall effect of which was to create AHI's

basis in Palm Canyon that did not correspond with the economic reality of AHI's investment.  Petitioner argues that CF Advisors' membership allowed Mr. Brooks to gain trading authority over Palm Canyon's account and served as an incentive for Mr. Brooks to perform on behalf of Palm Canyon.

The reasons petitioner offered for executing the MLD transaction are not credible.  Petitioner did not establish a nontax business purpose for the MLD transaction.  Accordingly, we hold that the MLD transaction fails the subjective prong of the economic substance doctrine.  We base our holding on the following facts.

a. <u>The Hamel Companies' Lack of a Current or Foreseeable Need To Hedge Foreign Currencies</u>

Before considering the MLD strategy, the Hamel companies had no interest in foreign currency trading, and there is no evidence that any of the Hamel companies had any experience in foreign currency investments.

At the time of the MLD transaction, the Hamel companies had no particular need to hedge foreign currencies.[77]  An option contract can provide a hedge only if there is an existing risk to

---

[77]According to Mr. Bessembinder, the MLD contracts, as digital options, were also not appropriate for managing or hedging the foreign exchange risks that would typically arise when doing business in foreign markets.  Generally, digital options would not be used as a hedge in normal international business operations, such as foreign sales, foreign production, importing, and exporting.

be managed.  Palm Canyon was not at risk on account of unexpected movements in the Japanese yen per U.S. dollar exchange rate from October to December 2001.  None of the Hamel companies' businesses had any contracts due in 2001 or 2002 that required payments in any foreign currency.  During 2001 Thighmaster had no ownership interest, directly or indirectly, in any foreign entity or bank account, and it paid no foreign taxes.  Although Mr. Hamel testified that he wanted to expand the Hamel companies' foreign business operations, petitioner introduced no evidence, aside from self-serving memoranda prepared on the eve of the MLD transaction, of any definite plans to expand operations overseas, and none of the evidence supports a finding that the Hamel companies would need foreign currency hedging in the foreseeable future.  Moreover, such a need never materialized for any of the Hamel companies before the termination of the Palm Canyon partnership in 2001 and the cessation of foreign currency trading altogether in 2003.

Furthermore, petitioner's contention that Palm Canyon entered into the MLD transaction to become familiar with foreign currency investments is not credible.  Mr. Hamel could have become familiar with such investments by consulting with his investment advisers.  He did not need to pay Cantley & Sedacca $325,000 and CF Advisors $20,000 to acquire such knowledge.  Similarly, we do not give any weight to Mr. Hamel's supposed need

to assess Mr. Brooks' investment performance, considering Mr. Brooks' temporary and limited role in Palm Canyon was already planned before the MLD transaction was even executed. Mr. Brooks' involvement only facilitated the claiming of the tax loss and had nothing to do with actually investing in foreign currency or options.

b. <u>Lack of Investigation Into the Foreign Currency Aspects of the MLD Contracts and the Participating Parties</u>

None of the parties principally responsible for executing the MLD transaction conducted a serious independent investigation of the foreign currency aspects of the MLD contracts or the MLD transaction participants. Neither Mr. Hamel nor Mr. Lamb sought to verify independently the pricing of the options or the possible outcomes under the MLD contracts with any person or entity independent of the MLD strategy. None of the relevant parties consulted with any of the banks the Hamel companies had previously used for foreign investment advice. Mr. Lamb's and Mr. Barish's investigation of Cantley & Sedacca and Mr. Ivsan was limited, consisting of a cursory review of Mr. Ivsan's background. The parties performed little due diligence on Mr. Brooks[78] and conducted no meaningful investigation of the role of Pryor Cashman or Mr. Kushner in promoting the MLD transaction.

---

[78]Mr. Lamb exchanged several emails with Mr. Brooks regarding Mr. Brooks' background, and Mr. Wells provided Mr. Barish a report regarding his inquiries on Mr. Brooks.

The primary focus of the pre-MLD transaction investigation was to provide the window-dressing that would ensure that the tax benefits had some prospect of being respected, that even if the tax benefits were not respected no penalty would be imposed, and that some of the people who would be involved in the MLD transaction were who they purported to be. Mr. Lamb and Mr. Barish reviewed the Bryan Cave opinion for its analysis of the tax benefits. Both parties paid particularly close attention to the discussion of the section 6662 penalty in the Bryan Cave opinion and Pryor Cashman's draft tax opinion. Mr. Lamb and Mr. Barish met with Pryor Cashman to discuss the tax aspects of the MLD transaction and Pryor Cashman's preparation of the tax opinion. The focus of the parties on the tax treatment of the MLD transaction, while ignoring all other aspects of the foreign currency investment, demonstrates that the real purpose of the MLD transaction was tax avoidance.

###### c. Lack of Rational Economic Behavior in Pricing the MLD Contracts

Respondent's experts, Mr. Bessembinder and Mr. Murphy, both concluded that the MLD options were overpriced and thus did not reflect reasonable market prices or rational economic behavior.[79]

---

[79]Petitioner did not present any expert testimony and did not convince us on cross-examination that respondent's experts were not credible. Consequently, we accept the conclusions of respondent's experts and do not spend time summarizing the factual bases of their opinions.

Using the Black-Scholes pricing model,[80] both experts found that the value of Palm Canyon's long MLD option was approximately $1.6 million, while the value of Palm Canyon's short MLD option was approximately $1.594 million. Both Palm Canyon and Société Générale thus purportedly obligated themselves to pay premiums that were approximately $3.4 million more than their respective MLD option's market price. Because the premium purportedly payable for the long MLD option essentially equaled the amount of ordinary loss the MLD transaction produced, Palm Canyon had an incentive to inflate the long MLD option's premium to generate a greater loss. By similarly overstating the price of the short MLD option, Palm Canyon achieved its desired loss while mimimizing the net premium payment to Société Générale; that net premium payment was the extent of Palm Canyon's economic outlay in executing the MLD transaction (aside from fees). Respondent's experts also determined that Palm Canyon overpaid by nearly $30,000 with respect to the net option premium. Additionally, both experts concluded that the $61,600 termination payment Palm Canyon received was significantly less than the difference

---

[80]The Black-Scholes option pricing model is the industry standard for pricing foreign currency option trades. Under the Black-Scholes model, the premium on a standard currency option is determined by six factors, including the spot market exchange rate at the time the option is valued, interest rates on each of the two currencies, the time until the option expiration date, the option strike price, and the volatility of the spot market exchange rate.

between the then market values of the MLD options, with Mr. Murphy estimating $90,000 as a more appropriate amount.

Petitioner introduced no expert testimony on the economics of the MLD transaction, and petitioner offers no explanation why the long and short MLD options were overpriced or why Palm Canyon received a termination payment below market value. Petitioner argues only that, unbeknownst to Mr. Brooks or any other relevant party, Société Générale overstated Palm Canyon's net premium so that it could pay a hidden $20,500 fee to Deutsche Banc Alex. Brown. While we will not speculate about the financial arrangements among Palm Canyon, Société Générale, and Deutsche Banc Alex. Brown with respect to the MLD transaction in the absence of credible evidence regarding the arrangement, we cannot conclude on the record that Mr. Brooks and others associated with Palm Canyon did not know about the Deutsche Banc Alex. Brown fee. Mr. Brooks and Mr. Ivsan determined the desired premium payments for the long and short MLD options in formulating the terms of the MLD contracts. Mr. Brooks testified that, in pricing the long and short MLD options, he provided Palm Canyon's desired premium payment to Société Générale, and Société Générale, in response, issued a strike price that Mr. Brooks concluded was reasonable under the Black-Scholes option pricing model. Because Société Générale issued a strike price in response to information provided by Mr. Brooks, the record does not support a conclusion

that Société Générale secretly overstated Palm Canyon's net premium payment.

Palm Canyon's overpayment of the net premium, coupled with the inflation of the premiums themselves and Palm Canyon's willingness to accept a termination payment below the MLD options' then market value, reflects Palm Canyon's disregard for the economics of the MLD contracts and evidences the tax motivations behind the MLD transaction. Palm Canyon's pricing of the MLD options was not reasonable under commercial practices in the option trading industry and demonstrates Palm Canyon's lack of profit motive in executing the MLD contracts.

> d. CF Advisors' Membership in Palm Canyon Solely To Facilitate the Tax Benefit Contemplated by the MLD Transaction

CF Advisors became a member of Palm Canyon solely to exploit the partnership tax rules. CF Advisors' membership in Palm Canyon caused Palm Canyon to become a partnership for tax purposes, which allowed AHI to claim an inflated basis in its Palm Canyon partnership interest. Mr. Brooks entered into such an arrangement (as a partner or member), ostensibly as a foreign currency investment adviser, in each of the 150 MLD transactions that he carried out for his MLD strategy clients in 2001. In its role as foreign currency trader for Palm Canyon, CF Advisors, through Mr. Brooks, purportedly had discretion to make whatever foreign currency trades he deemed would garner a profit.

However, Mr. Brooks simply carried out the trades necessary to create the tax benefit contemplated by the MLD strategy. The terms of the MLD contracts Mr. Brooks entered into had been predetermined to ensure the necessary ordinary loss would be generated to offset the Hamels' estimated 2001 taxable income. The other foreign currency trades that Mr. Brooks made in 2001 for Palm Canyon were significantly smaller in amount and, we think, were an obvious attempt to legitimize his status as a foreign currency trader for Palm Canyon.[81]

Shortly after CF Advisors joined Palm Canyon, AHI purchased CF Advisors' partnership interest to trigger liquidation of the Palm Canyon partnership and deemed distribution of its assets before the close of Thighmaster's 2001 tax year. The liquidation provided the occasion for the transfer of AHI's inflated basis in its Palm Canyon partnership interest to the Canadian dollars position and allowed AHI to claim an ordinary loss on its subsequent disposition.[82]

Petitioner argues that Palm Canyon was a special purpose venture that was formed to conduct a venture of limited duration. Petitioner suggests that the Hamel companies wanted experience in

[81]Our conclusion is reinforced by the fact that Mr. Brooks placed similar minor foreign currency trades for each of his 150 MLD strategy clients.

[82]Mr. Brooks terminated his partnership or membership interest before Dec. 31, 2001, in each of the 150 MLD transactions in which he participated.

foreign currency trading, and Mr. Lamb believed that the MLD contracts satisfied this purpose. Petitioner claims that the principal initial activity was a discrete transaction that would last only 60 days, and Palm Canyon as an entity was designed primarily for that initial venture.

Petitioner also contends that Palm Canyon was validly formed, had at least two legitimate business purposes, and had substantial economic effect. Petitioner claims that limited liability was the first business reason for establishing Palm Canyon as an entity. Petitioner also argues that Mr. Hamel's intention was that the foreign currency trading activities were part of the Hamel companies. Petitioner states that the historic model for the Hamel companies was that every separate activity was placed within its own qualified subchapter S subsidiary corporation, but because a subsidiary could not have an unrelated party as a shareholder, Palm Canyon was needed to allow Mr. Brooks' ownership. Petitioner suggests this was the second reason for creating Palm Canyon.

Although the goal of achieving limited liability through establishing a limited liability company might have been a valid business purpose for establishing Palm Canyon, we question the purpose of adding and then terminating CF Advisors as a partner. Although petitioner and Mr. Brooks claim that CF Advisors became a member in Palm Canyon to allow Mr. Brooks to gain trading

authority over Palm Canyon's Deutsche Banc Alex. Brown account, petitioner did not introduce any credible evidence to explain why CF Advisors needed to become a member in Palm Canyon to gain such authority. Before CF Advisors' membership in Palm Canyon, Mr. Hamel granted Mr. Brooks trading authority with respect to Palm Canyon's Deutsche Banc Alex. Brown account, and pursuant to this authority, Mr. Brooks executed the MLD contracts before the Palm Canyon partnership was created.

Petitioner also suggests that CF Advisors became a member of Palm Canyon to encourage Mr. Brooks to perform well on Palm Canyon's behalf and that Mr. Brooks' motive in joining the partnership was to make money. That explanation, however, cannot be reconciled with the prearranged buyout of CF Advisors; Cantley & Sedacca prepared documents pertaining to CF Advisors' termination from Palm Canyon at the outset of the MLD transaction (which Mr. Hamel signed on or about October 9, 2001), before CF Advisors even became a member in Palm Canyon. The record contains Mr. Lamb's notes of his September 26, 2001, meeting with Mr. Kushner, in which Mr. Ivsan and Mr. Barish participated by telephone. In paragraph 2 Mr. Lamb wrote:

> 2. Why is Clarion [Capital] bought out? Entirely up
> to the client--reason for termination--not comfortable
> with derivatives area as investment strategy. Also
> clients that have not made money not wanting to pay
> quarterly management fees. Client can stay on. Can
> keep Clarion as a partner in LLC. Termination of
> partnership causes outside basis to be attached to
> assets inside partnership. Transfer of partnership

> interest to a third party could also accomplish the same thing. Termination of the partnership or transfer of partnership interest is the only way to get the loss needed.

At trial Mr. Lamb also testified that Mr. Brooks had to be terminated as a member of Palm Canyon to ensure "that the tax transaction would work correctly."

The advance preparation of CF Advisors buyout documents as part of the same packet as other transaction documents and advance discussions about potential business reasons for buying out CF Advisors' interest in Palm Canyon show that all steps in the MLD transaction were prearranged and that the parties had no legitimate intention of pursuing foreign currency trading and were concerned exclusively with producing the contemplated tax benefit. We also find significant the fact that CF Advisors sold its Palm Canyon interest without any negotiations; no negotiations took place in any of Mr. Brooks' 150 similar transactions.

We conclude that the only purpose behind CF Advisors' participation in the MLD transaction was to further a carefully orchestrated and prearranged plan to manufacture a $5 million ordinary loss. CF Advisors' involvement as a foreign currency trader was mere window dressing for its role in assuring the recognition of this tax benefit.

e.    The MLD Strategy Was a Tax Shelter To Offset
      Mr. Hamel's Taxable Income

Mr. Brooks, Mr. Brubaker, and Mr. Ivsan developed the MLD strategy as a tax avoidance scheme and not to create an opportunity to hedge foreign currencies or achieve a pretax profit.  Mr. Brooks knew the MLD strategy was a "tax advantage" or "tax motivated" transaction.  Cantley & Sedacca marketed the MLD strategy as a tax shelter to accountants and financial advisers nationwide and sold it to approximately 150 clients.

Cantley & Sedacca, through Mr. Ivsan, presented the MLD strategy to Mr. Lamb to reduce the Hamels' 2001 Federal income tax liability.[83]  For the 2000 tax year the Hamels reported approximately $8.6 million in taxable income and paid nearly $3.4 million in Federal income tax, and estimates in June 2001 showed that the Hamels expected taxable income between $7 and $9 million in 2001.  Cantley & Sedacca designed the MLD transaction to reduce or eliminate the Hamels' projected income by producing (through Palm Canyon, AHI, and Thighmaster) a $5 million ordinary loss.  Because of the MLD transaction, the Hamels reduced their 2001 taxable income to zero and avoided approximately $1.5 million in 2001 Federal income tax.  We find that Mr. Hamel executed the MLD transaction for the sole purpose of sheltering

_____

[83]Mr. Lamb had been looking for a means to reduce the Hamels' tax liability as early as August 2001, when he met with the Skyline Group to discuss "high end tax products for big losses".

his income from tax, and we reject any testimony to the contrary as not credible. We conclude that Palm Canyon entered into the MLD transaction solely to reduce the Hamels' 2001 Federal income tax liability.

## 2. Objective Prong

To satisfy the objective prong, petitioner must demonstrate that the MLD transaction had a reasonable prospect of earning a profit. See, e.g., Horn v. Commissioner, 968 F.2d at 1237. Petitioner contends that Palm Canyon had a substantial opportunity to earn a profit on the MLD options. As discussed above, Palm Canyon had three possible outcomes following the expiration of the MLD contracts: (1) If both MLD options were out of the money, Palm Canyon would lose its $55,000 net investment; (2) if both MLD options were in the money, Palm Canyon would earn a maximum net profit of $33,000; or (3) if the long MLD option were in the money and the short MLD option were out of the money, Palm Canyon would hit the sweet spot and net $7,945,000. According to petitioner, Palm Canyon had a significant opportunity to earn a $33,000 profit if both MLD contracts were in the money and had a chance of receiving a high profit from hitting the sweet spot. Petitioner claims that the MLD contracts generated an actual economic profit of $6,600, which equaled a 12-percent return on a 60-day investment, and that Palm Canyon's subsequent 2001 foreign currency trading

activities generated an additional economic profit of $2,076.

Despite petitioner's claims that Palm Canyon could have earned a

significant profit in two of the three possible outcomes, we find

that taking transaction fees into account, Palm Canyon did not

have a reasonable expectation of earning a profit on the MLD

contracts.  Accordingly, we hold that the MLD transaction fails

the objective prong of the economic substance doctrine test.  We

base our holding on the following factors.

a.    Palm Canyon's Lack of a Realistic Chance of
      Hitting the Sweet Spot

Palm Canyon's chances of hitting the sweet spot were remote.

Mr. Lamb acknowledged that the likelihood of hitting the sweet

spot was small.  Mr. Brooks stated that there was only a 1.3-

percent chance of Palm Canyon's hitting the sweet spot, and none

of his 150 clients involved in an MLD strategy transaction

received a sweet spot payout.[84]  Respondent's experts concluded,

using the Black-Scholes pricing model, that the chance of hitting

the sweet spot was between 0.11 and 0.13 percent.

---

[84]Mr. Brooks testified that the sweet spot was not something
he considered but that it would have been "wonderful" if the MLD
contracts had hit the sweet spot.  Mr. Brooks also stated that he
terminated the Palm Canyon MLD contracts before maturity, despite
the Japanese yen per U.S. dollar exchange rate's relative
proximity to the sweet spot, because he feared the market's
volatility and wanted to lock in a profit.  We reject Mr. Brooks'
testimony regarding his reason for terminating the MLD contracts
before maturity as not credible.

From a practical standpoint, Palm Canyon's chances of hitting the sweet spot were zero under the terms of the MLD contracts governing the determination of the spot market exchange rate. The market practices at the time would have allowed Société Générale, as the calculation agent and determinant of the spot market exchange rate,[85] to assure that Palm Canyon would not hit the sweet spot.[86] As explained by respondent's experts, if Société Générale had followed industry market practices in determining the spot market exchange rate, Société Générale would have asked three or four other banks or brokers to quote a "bid" price at which they would buy a currency and an "ask" price at which they would sell a currency. In response Société Générale would have received a range of prices; generally, the bid and ask spread was 3 to 5 pips. Société Générale could then have chosen any price within that range.[87] Because the strike prices in the MLD contracts were only 2 pips apart,[88] Société Générale could

---

[85]At the time of the MLD contracts it was common industry practice for the bank issuing the option to also serve as the calculation agent.

[86]We came to a similar conclusion on analogous facts in a deficiency case, New Phoenix Sunrise Corp. & Subs. v. Commissioner, 132 T.C. ___, ___ (2009) (slip op. at 27-29) (relying on the testimony of the same expert).

[87]Today, an independent agency sets the fixing rate for each currency at 10 a.m. on the basis of an electronic average of prices.

[88]In order for Palm Canyon to hit the sweet spot under the
(continued...)

assure that Palm Canyon would not hit the sweet spot by choosing a price outside the specified range.  According to respondent's experts, nothing prevented Société Générale from selecting an exchange rate outside the sweet spot.  Both experts concluded that because of Société Générale's incentive to avoid payment on the long MLD option and its flexibility in selecting the spot market exchange rate, it was impossible for Palm Canyon to hit the sweet spot.  Had Palm Canyon had a legitimate profit motive in pursuing the MLD transaction, it could have attempted to avoid this disadvantage by trying to negotiate for the designation of an independent third party as the calculation agent or for a provision to determine the spot market exchange rate in an objective manner.

### b. Nullification of Any Potential Profit by Palm Canyon's MLD Transaction Fees

Disregarding the potential for the $7,945,000 sweet spot payout, petitioner maintains that the MLD options had an opportunity of producing a $33,000 profit if both options were in the money.  However, if we account for the fees paid by Palm Canyon in executing the MLD transaction, $325,000 to Cantley &

---

[88](...continued)
MLD contracts, the spot market exchange rate would have to be equal to or greater than 124.65 but less than 124.67, a 2-pip spread.  The 2-pip spread in the MLD contracts was unusually close.  Respondent's expert Mr. Murphy testified that he had never priced an option 2 pips apart in his 20-plus years of trading foreign currencies.  In all of the 150 MLD transactions Mr. Brooks participated in, the sweet spot was 2 pips apart.

Sedacca and $20,000 to CF Advisors, Palm Canyon could not have earned a profit.

Petitioner argues that the fees paid to Cantley & Sedacca and CF Advisors cannot be charged as transaction costs in determining the profitability of the MLD transaction. Petitioner asserts that the $20,000 paid to CF Advisors was a flat annual fee that covered not only the MLD contracts but also Mr. Brooks' 2001 foreign currency trading. Additionally, petitioner contends that the $325,000 fee paid to Cantley & Sedacca must be considered independent of any analysis pertaining to the potential profitability of the MLD contracts because Palm Canyon paid the fee to determine the appropriate tax treatment of the transaction. Because Palm Canyon planned to claim a sizable tax benefit as a result of the MLD transaction, petitioner asserts it would have been irresponsible to claim such a large tax benefit without assuring the entitlement to the benefit. Petitioner argues that respondent cannot use the costs incurred to verify the entitlement to the tax benefit to establish the unprofitability of the MLD contracts.

Petitioner's arguments are unavailing. The fees Palm Canyon paid to Cantley & Sedacca and CF Advisors were for executing the MLD transaction. We cannot ignore these fees in determining the profitability of the MLD transaction.

Palm Canyon's $20,000 payment to CF Advisors was not a flat, annual foreign currency adviser fee. The $20,000 payment went to Mr. Brooks for his involvement in the MLD transaction, including his execution of the MLD contracts, his role in CF Advisors' membership and termination in Palm Canyon, and his attempt to legitimize Palm Canyon's investment activities through several smaller foreign currency trades.

Similarly, the $325,000 Palm Canyon paid to Cantley & Sedacca was for Cantley & Sedacca's extensive role in executing the MLD transaction. While petitioner attempts to create a distinction between economic transaction fees and fees paid to verify the tax treatment of an item, the record establishes that Palm Canyon did not pay Cantley & Sedacca just to verify the tax aspects of the MLD transaction. Cantley & Sedacca introduced the MLD strategy to Mr. Hamel, structured the MLD transaction, and carried out each of the steps necessary to achieve the desired tax benefit. The extent of services provided beyond the verification of tax benefits is evidenced by Cantley & Sedacca's outsourcing the task of drafting a tax opinion to Pryor Cashman, to which it paid only $50,000 of its $325,000 fee.

Moreover, we reject petitioner's argument that the costs incurred to verify the tax aspects of the MLD transaction are not attributable to the MLD transaction when examining its profitability. Petitioner offers no authority to support this

argument. Courts examining the profitability of a transaction in an economic substance analysis generally consider the fees paid to promoters, facilitators, and tax advisers associated with the questioned transaction. See, e.g., <u>Jade Trading, LLC v. United States</u>, 80 Fed. Cl. at 49-50. Furthermore, if petitioner's argument accomplishes anything, it reinforces Palm Canyon's tax avoidance purpose for entering the MLD transaction, because no rational investor would enter a transaction, absent the tax motivation, if the cost of verifying the tax aspects of the transaction grossly exceeded the expected economic profit.

We hold that the $20,000 paid to CF Advisors and the $325,000 paid to Cantley & Sedacca must be included in our analysis of the profitability of the MLD transaction. Accordingly, we conclude that Palm Canyon did not have a reasonable opportunity to earn a pretax profit on the MLD transaction because even if both options were in the money and Palm Canyon earned a $33,000 profit, Palm Canyon would still have lost approximately $312,000 on the transaction after taking into account the transaction fees.

D. Conclusion

Petitioner has failed to prove that the MLD transaction, including the steps of creating the Palm Canyon partnership and terminating it approximately 2 months later, satisfied either the subjective prong or the objective prong of the economic substance

doctrine. Petitioner has not introduced credible evidence to establish that Palm Canyon had a legitimate nontax business purpose for entering into the MLD transaction, and the transaction did not have a reasonable prospect of achieving a pretax profit. A review of the MLD transaction reveals a prearranged set of transactions that were not imbued with any meaningful economic substance independent of tax benefits. See Horn v. Commissioner, 968 F.2d at 1236; see also Sacks v. Commissioner, 69 F.3d at 988. Inasmuch as the MLD transactions satisfied neither the subjective nor the objective prong of the economic substance doctrine, we conclude that the MLD contracts and creation and termination of the Palm Canyon partnership did not constitute genuine multiparty transactions with economic substance that were compelled or encouraged by business or regulatory realities, that were imbued with tax-independent considerations, and that were not shaped by tax avoidance features with meaningless labels. Accordingly, we sustain respondent's adjustments to Palm Canyon's return.

V.    Section 6662 Accuracy-Related Penalty

In the FPAA respondent determined that a 40-percent gross valuation misstatement penalty under section 6662(a), (b)(3), (e), and (h) applies. On brief respondent argues that AHI's purported $5 million contribution of the long MLD option should have been either zero or alternatively, $55,000. Respondent also

suggests that AHI overstated its basis in its partnership interest and the basis in the Canadian dollars position distributed in the purported liquidation of Palm Canyon by more than 400 percent of the correct amount.

In the alternative, respondent determined a 20-percent accuracy-related penalty under section 6662(a) on the portion of any underpayment resulting from his adjustments to items on Palm Canyon's return attributable to negligence or disregard of rules and regulations or resulting in a substantial understatement of income tax.[89]  Sec. 6662(a) and (b)(1) and (2).

A.    Preliminary Matters

1.    Jurisdiction

The applicability of any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item must be determined at the partnership level.  Sec. 6226(f); sec. 301.6221-1(c), Proced. & Admin. Regs.; see also New Millennium Trading, L.L.C. v. Commissioner, 131 T.C. ___ (2008) (upholding the validity of section 301.6221-1T(c) and (d), Temporary Proced. & Admin. Regs., 64 Fed. Reg. 3838 (Jan. 26, 1999)); sec. 301.6221-1T(c), Temporary Proced. & Admin. Regs.,

---

[89]The Commissioner may not stack or compound alternative components of the sec. 6662 penalty to determine a penalty greater than the maximum penalty of 20 percent on any given portion of an underpayment, or 40 percent if such portion is attributable to a gross valuation misstatement.  Sec. 1.6662-2(c), Income Tax Regs.

<u>supra</u> (providing that any penalty, addition to tax, or additional amount that relates to an adjustment of partnership item, is determined at the partnership level). Partnership-level determinations include all the legal and factual determinations that form the basis of the determination of any penalty, addition to tax, or additional amount. Sec. 301.6221-1(c), Proced. & Admin. Regs.

Partner-level defenses to any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item may not be asserted in the partnership-level proceeding. Sec. 301.6221-1(c) and (d), Proced. & Admin. Regs.; sec. 301.6221-1T(c) and (d), Temporary Proced. & Admin. Regs., <u>supra</u>; see also <u>New Millennium Trading, L.L.C. v. Commissioner</u>, <u>supra</u> at ___ (slip op. at 19-23). Individual partners may raise partner-level defenses through separate refund actions following assessment and payment of the penalty. Sec. 301.6221-1(c) and (d), Proced. & Admin. Regs. Partner-level defenses are limited to those that are personal to the partner or depend on the partner's separate return and cannot be determined at the partnership level. <u>Id.</u> For example, a partner may raise a personal reasonable cause defense under section 6664(c)(1). <u>Id.</u> All other defenses are partnership-level defenses. Defenses of AHI as Palm Canyon's managing member and TMP are partnership-level defenses. See, e.g., <u>Whitehouse Hotel Ltd. Pship. v.</u>

<u>Commissioner</u>, 131 T.C. 112, 173 (2008); <u>Santa Monica Pictures,</u>
<u>LLC v. Commissioner</u>, T.C. Memo. 2005-104.

        2.    <u>Burden of Production</u>

Under section 7491(c), the Commissioner has the burden of
production in any court proceeding with respect to the liability
of any individual for any penalty, addition to tax, or additional
amount imposed by the Code.  However, section 7491(c) does not
shift the burden of proof, which remains on the taxpayer.  <u>Higbee</u>
<u>v. Commissioner</u>, 116 T.C. 438, 446-447 (2001).

Petitioner incorrectly implies that the burden of proof
falls on respondent with respect to the section 6662 accuracy-
related penalty.  Petitioner does not, however, provide any
support for its position.  It is well established that a taxpayer
has the burden of proving that the Commissioner's determinations
regarding the section 6662 accuracy-related penalty are
incorrect.  <u>Id.</u>  What is not so clear, however, is whether
section 7491(c) imposes the initial burden of production
regarding the section 6662 accuracy-related penalty on the
Commissioner when the taxpayer is an entity that has petitioned
this Court under section 6226.  By its terms, section 7491(c)
applies only to the liability of "any individual" for
penalties.[90]  Thus, in this proceeding section 7491(c) is

_____

        [90]In contrast, sec. 7491(a), which provides the general rule
for shifting the burden of proof to the Commissioner in certain
                                        (continued...)

arguably inapplicable because petitioner is not an individual. See <u>Santa Monica Pictures, LLC v. Commissioner</u>, <u>supra</u>; <u>Long Term Capital Holdings v. United States</u>, 330 F. Supp. 2d 122 (D. Conn. 2004), affd. 150 Fed. Appx. 40 (2d Cir. 2005).

We need not resolve this uncertainty; even if we assume that respondent has the initial burden of production under section 7491(c) with respect to the section 6662 accuracy-related penalty, we are satisfied that respondent has carried any such burden with respect to the appropriateness of applying the accuracy-related penalty. Consequently, petitioner must come forward with evidence sufficient to persuade us that respondent's penalty determinations are incorrect. <u>Higbee v. Commissioner</u>, <u>supra</u> at 447.

Respondent has made several alternative determinations with respect to the accuracy-related penalty. We address each of them below.

B. <u>Gross Valuation Misstatement</u>

Section 6662(a) and (b)(3) imposes a 20-percent accuracy-related penalty on the portion of an underpayment attributable to any substantial valuation misstatement. A substantial valuation misstatement exists if the value of any property, or the adjusted basis of any property, claimed by the

[90](...continued)
circumstances, applies in ascertaining the liability of a "taxpayer".

taxpayer is 200 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis. Sec. 6662(e)(1). The penalty imposed by section 6662(a) increases from 20 to 40 percent if the underpayment is attributable to a gross valuation misstatement. Sec. 6662(h). A gross valuation misstatement occurs if the value of any property, or the adjusted basis of any property, claimed by the taxpayer is 400 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis. Sec. 6662(h)(2)(A).

We have concluded that the MLD transaction, including the MLD contracts and the creation and termination of the Palm Canyon partnership, lacked economic substance. Our conclusion, as it pertains to the admission of CF Advisors as a Palm Canyon member and the purchase of its partnership interest, which in turn resulted in creation and termination of the Palm Canyon partnership, effectively disregards the Palm Canyon partnership for Federal income tax purposes. In Petaluma FX Partners, LLC v. Commissioner, 131 T.C. at 100, we held that if a partnership is disregarded for tax purposes, the correct outside bases of the purported partners is zero.[91] In Petaluma we also

_____

[91]Although we have held that generally the basis in a partner's partnership interest is not a partnership item that must be determined at a partnership-level proceeding, see Domulewicz v. Commissioner, 129 T.C. 11, 20-21 (2007), affd. and remanded on other grounds sub nom. Desmet v. Commissioner, 581 F.3d 297 (6th Cir. 2009), we have also held that if a partnership
(continued...)

held that if a partnership is disregarded for tax purposes, the gross valuation misstatement penalty applies.[92]  Id. at 105.

Petitioner argues that the gross valuation misstatement penalty does not apply because the tax deficiency resulting from respondent's adjustments is attributable to the lack of economic substance of the MLD contracts and not to a valuation misstatement.  In support of its argument, petitioner primarily

---

[91](...continued)
is disregarded for Federal income tax purposes, the Court has jurisdiction in a partnership-level proceeding to determine that there can be no outside bases in such partnership, see Petaluma FX Partners, LLC v. Commissioner, 131 T.C. 84, 100 (2008).

[92]The majority of the Courts of Appeals that have ruled on the application of the valuation misstatement penalty in the context of a disregarded transaction (under both sec. 6662 and its predecessor statute, sec. 6659) follows a similar approach. See, e.g., Merino v. Commissioner, 196 F.3d 147, 155 (3d Cir. 1999) ("whenever a taxpayer knowingly invests in a tax avoidance entity which the taxpayer should know has no economic substance, the valuation overstatement penalty is applied as a matter of course"), affg. T.C. Memo. 1997-385; Zfass v. Commissioner, 118 F.3d 184, 191 (4th Cir. 1997) (the valuation overstatement penalty applied because the value overstatement was a primary reason for the disallowance of the claimed tax benefits), affg. T.C. Memo. 1996-167; Illes v. Commissioner, 982 F.2d 163, 167 (6th Cir. 1992) (the entire artifice of the tax shelter at issue was constructed on the foundation of the overvaluation of its assets), affg. T.C. Memo. 1991-449; Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991) ("The lack of economic substance was due in part to the overvaluation, and thus the underpayment was attributable to the valuation overstatement"), affg. T.C. Memo. 1989-684 as supplemented by T.C. Memo. 1990-205; Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989) ("When an underpayment stems from disallowed depreciation deductions or investment credit due to lack of economic substance, the deficiency is attributable to overstatement of value"), affg. T.C. Memo. 1988-427; see also Santa Monica Pictures, LLC v. Commissioner, T.C. Memo. 2005-104; Jade Trading, LLC v. United States, 80 Fed. Cl. 11, 54 (2007).

relies on Gainer v. Commissioner, 893 F.2d 225, 228 (9th Cir. 1990), affg. T.C. Memo. 1988-416. In Gainer, the tax deficiency at issue resulted from the taxpayer's failure to place an asset in service during the relevant tax year and not from the overvaluation of the property itself. Id. Because the Commissioner disallowed the taxpayer's claimed tax benefits on grounds independent from any valuation overstatement, the Court of Appeals for the Ninth Circuit concluded that the resulting underpayment of tax was not attributable to a valuation misstatement. Id. at 228-229. Petitioner argues that AHI's overstated basis in its Palm Canyon partnership interest does not constitute a valuation misstatement because it was not attributable to the valuation of any asset or position.

The facts in Gainer v. Commissioner, supra, are distinguishable from the present set of facts. In Gainer, the court disallowed the claimed tax benefits on grounds independent from any alleged valuation misstatement. In contrast, AHI's claimed inflated basis in its Palm Canyon partnership interest directly contributed to our decision to disregard the MLD transaction on economic substance grounds. Achieving an inflated basis in AHI's Palm Canyon partnership interest was the primary objective of the tax avoidance scheme that Mr. Hamel pursued. The substantial tax loss on the disposition of the Canadian dollars position depended directly on AHI's inflated basis in its

Palm Canyon partnership interest. The $5 million overstatement of basis claimed by AHI represented the predetermined amount Mr. Hamel needed to negate his 2001 Federal income tax liability. Accordingly, the underpayment resulting from our decision to disregard the MLD transaction as a whole is directly attributable to the overstatement of AHI's adjusted basis in its Palm Canyon partnership interest.

Petitioner also cites Klamath Strategic Inv. Fund, LLC v. United States, 472 F. Supp. 2d 885 (E.D. Tex. 2007), affd. in part, vacated in part and remanded 568 F.3d 537 (5th Cir. 2009), in which the U.S. District Court for the Eastern District of Texas held that the valuation misstatement penalty does not apply when a transaction is disregarded for lack of economic substance, finding that the resulting underpayment of tax is attributable to the disregard of the transaction and not to a valuation misstatement. The District Court cited Heasley v. Commissioner, 902 F.2d 380, 383 (5th Cir. 1990), revg. T.C. Memo. 1988-408, as controlling. See Klamath Strategic Inv. Fund, LLC v. United States, 472 F. Supp. 2d at 900. In Heasley v. Commissioner, supra at 383, another case on which petitioner attempts to rely, the Court of Appeals for the Fifth Circuit indicated that the Commissioner can impose a valuation misstatement penalty only where the underpayment is attributable to a valuation overstatement and not where the deficiency is attributable to an

improper deduction or credit.  In <u>Heasley</u>, the Court of Appeals

for the Fifth Circuit noted that "Whenever the I.R.S. totally

disallows a deduction or credit, the I.R.S. may not penalize the

taxpayer for a valuation overstatement included in that deduction

or credit."  <u>Id.</u>; see also <u>Keller v. Commissioner</u>, 556 F.3d 1056,

1060-1061 (9th Cir. 2009), affg. in part and revg. in part T.C.

Memo. 2006-131.

We believe that we are not constrained by the precedents of

the Courts of Appeals for the Ninth or Fifth Circuit for the

following reasons.  Under <u>Golsen v. Commissioner</u>, 54 T.C. 742,

757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we follow any

decisions of the U.S. Court of Appeals to which appeal lies that

are squarely on point.  Section 7482(b)(1)(E) provides that in

the case of a petition filed under section 6226, a decision by

this Court may be reviewed by the U.S. Court of Appeals for the

circuit in which the partnership has its principal place of

business.  Appellate venue under section 7482 is determined as of

the time the petition seeking redetermination of tax liability

was filed with the Court.  Sec. 7482(b)(1) (flush language).  If

for any reason no subparagraph of section 7482(b)(1) applies,

then the decision may be reviewed by the Court of Appeals for the

District of Columbia Circuit.  <u>Id.</u>  The Secretary and the

taxpayer may also elect to stipulate in writing the U.S. Court of

Appeals to which appeal lies.  Sec. 7482(b)(2).

Although both parties stated in their opening briefs that this case is appealable to the Court of Appeals for the Ninth Circuit, respondent has reversed course and argues in his reply brief that venue for an appeal is the Court of Appeals for the District of Columbia Circuit. We agree that venue for an appeal is the Court of Appeals for the District of Columbia Circuit. Palm Canyon's partnership status was terminated for Federal tax purposes on December 18, 2001, when AHI purchased CF Advisors' partnership interest and Palm Canyon reverted to a single-member limited liability company. Palm Canyon's 2001 Form 1065 is clearly marked as a final return. The parties also stipulated that "Palm Canyon's status as a limited liability company under the laws of the State of Delaware was cancelled on June 1, 2005." Accordingly, we conclude that the Palm Canyon partnership did not have a principal place of business when the petition was filed.

The Court of Appeals for the District of Columbia Circuit has not yet considered the issue of whether the valuation misstatement penalty applies to the underpayments attributable to overstated basis in property where the transaction is a sham or lacks economic substance. Accordingly, we may give effect to our own views on the issue. See Golsen v. Commissioner, supra at 757. As discussed above, we have held that when a partnership is disregarded for tax purposes, the gross valuation misstatement penalty applies. Petaluma FX Partners, LLC v. Commissioner, 131

T.C. at 105.  Our holding is consistent with views of the majority of the Courts of Appeals that have addressed whether the valuation misstatement penalty applies to disregarded transactions.  See cases cited supra note 92.

We sustain the 40-percent gross valuation misstatment penalty under section 6662(h).

C.  Negligence

Section 6662(a) and (b)(1) imposes an accuracy-related penalty of 20 percent on any portion of an underpayment of tax attributable to negligence or disregard of rules or regulations. For purposes of section 6662, the term "negligence" includes any failure to make a reasonable attempt to comply with Code provisions or to exercise ordinary and reasonable care in preparing a tax return.  Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.  Rules or regulations include the provisions of the Code, temporary or final regulations issued under the Code, and revenue rulings or notices issued by the IRS.  Sec. 1.6662-3(b)(2), Income Tax Regs.  Negligence is determined by testing a taxpayer's conduct against that of a reasonable, prudent person.  See Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982).  Negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return which would seem to a reasonable and

prudent person to be "too good to be true" under the circumstances. Sec. 1.6662-3(b)(1)(ii), Income Tax Regs. A return position that has a reasonable basis is not attributable to negligence. Sec. 1.6662-3(b)(1), Income Tax Regs. A reasonable basis connotes significantly more than not being frivolous or patently improper. Sec. 1.6662-3(b)(3), Income Tax Regs. The reasonable basis standard is not satisfied by a return position that is merely arguable or colorable. Id.

Petitioner argues that because the relevant inquiry is whether AHI, as Palm Canyon's managing member and TMP, was negligent in executing the MLD transaction, we must focus solely on the conduct of Mr. Hamel, the sole owner of AHI (through Thighmaster) at all relevant times. Petitioner asks that we exclude Mr. Lamb from our negligence analysis because he was not an AHI officer until after the MLD transaction occurred and he had no financial interest or legal authority over Palm Canyon or AHI at that time. According to petitioner, Mr. Hamel reasonably relied on several experts, including Mr. Lamb, Mr. Brooks, Mr. Barish, and Pryor Cashman in his decision to enter the MLD transaction. Petitioner argues that Mr. Hamel relied on Mr. Lamb to investigate the MLD transaction, assess the credibility of Mr. Brooks, discuss the Pryor Cashman opinion with Mr. Kushner, and work with Mr. Kipp, Palm Canyon's return preparer. Petitioner also argues that Mr. Hamel relied on Mr. Brooks with respect to

the investment decisions and technical aspects of the MLD transaction and that Mr. Hamel depended on Mr. Barish to perform due diligence with respect to the MLD transaction and Pryor Cashman opinion. Lastly, petitioner argues that Mr. Hamel relied on the Pryor Cashman opinion for the tax treatment of the MLD transaction. Petitioner concludes that because the MLD transaction involved complicated issues and ample credible legal authority existed for the position Palm Canyon took on its return, Mr. Hamel acted reasonably and in a prudent manner in relying on their advice.

We do not agree with petitioner's attempt to exclude Mr. Lamb from the ambit of our analysis of the negligence penalty. While we agree that we must examine the conduct of AHI because it was the managing member and TMP of Palm Canyon,[93] we are not restricted to examining the behavior of Mr. Hamel. Mr. Lamb served as a director and held the offices of treasurer/CFO and secretary of AHI. While Mr. Lamb did not hold a formal position with AHI until after the MLD transaction, he began serving as a

---

[93]The applicability of the negligence penalty depends on the conduct of the partnership's partners. See Jade Trading, LLC v. Commissioner, 80 Fed. Cl. at 55. While CF Advisors was also a member in Palm Canyon in 2001, we do not examine the behavior of CF Advisors' sole member, Mr. Brooks, because he played no role in the decision to execute the MLD transaction or in the reporting of the tax treatment. As discussed above, CF Advisors' transitory membership in Palm Canyon was merely a means to achieve the tax benefit contemplated by the MLD transaction. See supra pp. 62-66.

director and officer as of December 31, 2001, before Palm Canyon filed its return. During this time, Mr. Lamb had ample opportunity to review the tax consequences of the MLD transaction, including the conclusions reached in the Pryor Cashman opinion, and investigate its proper tax reporting. Because of his intimate involvement with the MLD transaction, Mr. Lamb was well positioned to assess its viability. Mr. Lamb acquiesced in Palm Canyon's tax treatment of the MLD transaction and signed Palm Canyon's return as AHI's CFO. Accordingly, we analyze Mr. Hamel's and Mr. Lamb's involvement in the MLD transaction in assessing whether AHI was negligent.

As we discussed above, Cantley & Sedacca promoted the MLD strategy as a tax avoidance scheme to approximately 150 clients, including Mr. Lamb, who then introduced the strategy to Mr. Hamel. For a $325,000 fee, Cantley & Sedacca provided Mr. Hamel with a foreign currency investment arrangement designed to generate a substantial tax loss that would obliterate Mr. Hamel's projected 2001 income. Before 2001 neither Mr. Hamel nor Mr. Lamb had experience with, or expressed interest in, foreign currency investments, and the Hamel companies had no need for those investments. Mr. Lamb's initial reaction to the tax benefits generated by the MLD strategy was that they were "too good to be true".

Despite the numerous red flags surrounding the legitimacy of the MLD strategy, Mr. Hamel and Mr. Lamb conducted a limited investigation of the principal parties involved in executing the MLD transaction. Mr. Hamel essentially delegated all responsibility to investigate the MLD strategy to Mr. Lamb. Mr. Lamb and Mr. Barish conducted only a superficial investigation of the parties involved. Mr. Lamb's background check on Mr. Brooks consisted of Internet research. Mr. Barish's investigation of Cantley & Sedacca was limited to verifying whether it was a "valid law firm" and confirming that Mr. Ivsan received an LL.M. from New York University. No one investigated Mr. Kushner or Pryor Cashman and their role in promoting the MLD strategy. The background report on Mr. Brooks that Mr. Barish obtained from Mr. Wells provided little information aside from confirming Mr. Brooks' identity. Mr. Lamb and Mr. Barish attempted to gain authorization from Mr. Brooks to obtain his credit report, but Mr. Brooks denied this request. Neither Mr. Lamb nor Mr. Barish attempted to verify the clients Mr. Brooks claimed to have.

Mr. Hamel also delegated to Mr. Lamb and Mr. Barish all responsibility to investigate the technical aspects of the MLD strategy. However, Mr. Lamb limited his investigation of the MLD contracts to Internet research on MLDs. Mr. Lamb did not attempt to verify the pricing of the MLD options using the Black-Scholes pricing model or consult anyone independent of Cantley & Sedacca

regarding the technical aspects of the MLD transaction.  Mr. Lamb did not provide any opinion regarding the proper tax treatment of the MLD transaction.  He testified that he did not understand the technical tax aspects of the MLD transaction and was unqualified to analyze the technical issues contained in the Pryor Cashman opinion.

Likewise, Mr. Barish did not provide an opinion regarding the proper tax treatment of the the MLD transaction.  Mr. Barish relied on the Pryor Cashman opinion, and he and Mr. Lamb recommended that Mr. Hamel proceed with the MLD transaction.  However, any reliance on the Pryor Cashman opinion was unreasonable for several reasons.  First, Pryor Cashman, which prepared between 40 and 50 tax opinions relating to the MLD strategy during 2001 and 2002, was part of the Cantley & Sedacca promoter team and had a conflict of interest.  See Hansen v. Commissioner, 471 F.3d 1021, 1031 (9th Cir. 2006) ("a taxpayer cannot negate the negligence penalty through reliance on a transaction's promoters or on other advisors who have a conflict of interest."), affg. T.C. Memo. 2004-269; Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 98 (2000) ("Reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about."), affd. 299 F.3d 221 (3d Cir. 2002).

Second, Pryor Cashman explicitly stated that the Pryor Cashman opinion "may not be relied upon (and is not otherwise released) unless and until" it receives signed investor representations from Mr. Hamel.  Mr. Hamel did not provide the required signed representations.

Mr. Lamb, a C.P.A., is an experienced tax practitioner who knew that the MLD strategy was highly suspect.  He knew that the MLD strategy was geared toward tax avoidance.  Despite this knowledge, Mr. Lamb, as treasurer and CFO of AHI, failed to make a reasonable attempt to ascertain the correctness of Palm Canyon's tax treatment of the MLD transaction through a proper and thorough investigation.  Accordingly, we hold that the underpayment resulting from the MLD transaction was attributable to negligence, and we sustain respondent's alternative determination under section 6662(b)(1).

D.    Substantial Understatement

Section 6662(a) and (b)(2) imposes a 20-percent accuracy-related penalty on the portion of an underpayment attributable to any substantial understatement of income tax. An understatement is defined as the excess of the amount of tax required to be shown on the return for a taxable year over the amount of tax imposed that is shown on the return, reduced by any rebate.  Sec. 6662(d)(2)(A).  An understatement of income tax is substantial if the understatement exceeds the greater of 10

percent of the tax required to be shown on the return for the taxable year or $5,000 ($10,000 in the case of a corporation). Sec. 6662(d)(1).

Any understatement is reduced to the extent it is attributable to an item:  (1) If there is or was substantial authority for the taxpayer's treatment for such item, or (2) the taxpayer adequately discloses the relevant facts affecting the item's tax treatment in the return or a statement attached to the return and there is a reasonable basis for the tax treatment of such item by the taxpayer.  Sec. 6662(d)(2)(B).  However, if an item is attributable to a tax shelter, adequate disclosure will not allow a taxpayer to avoid the substantial understatement penalty, and substantial authority will not reduce a taxpayer's understatement, unless the taxpayer reasonably believed that his tax treatment of the item was more likely than not the proper treatment.  Sec. 6662(d)(2)(C)(i).  For purposes of section 6662(d)(2)(C), a "tax shelter" is defined as:  (1) A partnership or other entity; (2) any investment plan or arrangement; or (3) any other plan or arrangement, if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax.  Sec. 6662(d)(2)(C)(iii).

Petitioner contends that Palm Canyon had substantial authority for its tax treatment of the MLD transaction and that

Palm Canyon adequately disclosed this position on its return.[94]
Petitioner also asserts that, even if the MLD transaction
constituted a tax shelter under section 6662(d)(2)(C)(iii), on
the basis of the existing authority at the time the MLD
transaction occurred, Palm Canyon reasonably believed that more
likely than not the tax benefits would be respected.  Petitioner
cites the Bryan Cave opinion and the Pryor Cashman opinion as the
authority on which Mr. Hamel and his advisers relied in reaching
their conclusion that their position on the MLD transaction was
more likely than not proper.

Because the sole purpose of the MLD transaction was tax
avoidance, we have disregarded the effects of the MLD transaction
under the economic substance doctrine.  Accordingly, we conclude
that the MLD transaction meets the definition of a tax shelter
under section 6662.  Petitioner therefore may not reduce Palm
Canyon's understatement by demonstrating adequate disclosure.
See sec. 6662(d)(2)(C)(i)(I).  In order to avoid liability for
the section 6662(a) penalty under the substantial understatement
prong, petitioner must show that Palm Canyon had substantial
authority for its tax treatment of the MLD transaction and that

---

[94]The amount of the understatement attributable to
respondent's adjustments to Palm Canyon's partnership items must
be determined at the partner level.  See secs. 301.6231(a)(5)-
1(e), 301.6231(a)(6)-1(a)(3), Proced. & Admin. Regs.  However,
whether Palm Canyon had substantial authority or adequately
disclosed the MLD transaction must be determined at the
partnership level.  See sec. 6226(f).

it reasonably believed that this tax treatment was more likely than not proper. See sec. 6662(d)(2)(C)(i)(II).

Substantial authority for the tax treatment of an item exists only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment. Sec. 1.6662-4(d)(3)(i), Income Tax Regs. The weight accorded an authority depends on its relevance and persuasiveness and the type of document providing the authority. Sec. 1.6662-4(d)(3)(ii), Income Tax Regs. Whether substantial authority exists is determined by an objective standard involving an analysis of the law and application of the law to relevant facts. Sec. 1.6662-4(d)(2), Income Tax Regs. The taxpayer's belief that there is substantial authority for the tax treatment of an item is thus not relevant in determining whether there is substantial authority for that treatment. Sec. 1.6662-4(d)(3)(i), Income Tax Regs. The substantial authority standard requires more than the "reasonable basis" standard of section 1.6662-3(b)(3), Income Tax Regs. (significantly higher than not frivolous or patently improper), but is less stringent than the "more likely than not standard" (greater than 50-percent likelihood of the position being upheld). Sec. 1.6662-4(d)(2), Income Tax Regs. Substantial authority must exist at the time the return is filed or must have existed at the end of the taxpayer's taxable year (in this case,

July 19, 2002, and December 18, 2001, respectively).  Sec.
1.6662-4(d)(3)(iv)(C), Income Tax Regs.  Petitioner bears the
burden of proving substantial authority.  See Higbee v.
Commissioner, 116 T.C. at 446.

Petitioner's position with respect to the tax treatment of
the MLD transaction relies on Helmer v. Commissioner, T.C. Memo.
1975-160, and its progeny for the proposition that contingent
liabilities, such as the short MLD option, do not constitute
liabilities under section 752.  However, reliance on Helmer is
not enough to establish substantial authority for Palm Canyon's
reporting of the MLD transaction.  Petitioner must also show that
it made a reasonable evaluation of the law regarding economic
substance and that that evaluation enabled it reasonably to
conclude that it was more likely than not that the MLD
transaction would be respected for Federal income tax purposes.

The ability of courts to disregard transactions devoid of
economic substance is well established.  See Horn v.
Commissioner, 968 F.2d at 1236 ("The sham transaction doctrine is
an important judicial device for preventing the misuse of the tax
code"; the doctrine "generally works to prevent taxpayers from
claiming the tax benefits of transactions, which, although they
may be within the language of the Code, are not the type of
transaction Congress intended to favor.").  Any evaluation of
authority for purposes of section 6662 with respect to a tax

shelter transaction must take the law with respect to economic substance into account.  Neither Palm Canyon nor its TMP and advisers evaluated the MLD transaction for its economic substance, and they did not conclude on the basis of any reasonable investigation that the transaction would be respected for Federal income tax purposes.

Palm Canyon received ample warning that respondent was not likely to respect its tax treatment of the MLD transaction.  On September 5, 2000, more than a year before the MLD transaction occurred, the IRS published Notice 2000-44, supra,[95] in which the IRS discussed certain types of transactions designed to produce noneconomic tax losses by artificially overstating partnership basis and explained that such losses were not allowable as deductions for Federal income tax purposes and could result in penalties to taxpayers.  The notice provided the following transaction as an example which, absent the offsetting $50 million deposits and fixed yield provisions, resembles the MLD transaction:

> a taxpayer purchases and writes options and purports to create substantial positive basis in a partnership interest by transferring those option positions to a partnership.  For example, a taxpayer might purchase call options for a cost of $1,000X and simultaneously write offsetting call options, with a slightly higher

---

[95]Notices published by the IRS in the Internal Revenue Bulletin are considered authority for purposes of determining whether there is substantial authority for the tax treatment of an item.  Sec. 1.6662-4(d)(3)(iii), Income Tax Regs.

strike price but the same expiration date, for a
premium of slightly less than $1,000X.  Those option
positions are then transferred to a partnership which,
using additional amounts contributed to the
partnership, may engage in investment activities.

Under the position advanced by the promoters of
this arrangement, the taxpayer claims that the basis in
the taxpayer's partnership interest is increased by the
cost of the purchased call options but is not reduced
under § 752 as a result of the partnership's assumption
of the taxpayer's obligation with respect to the
written call options.  Therefore, disregarding
additional amounts contributed to the partnership,
transaction costs, and any income realized and expenses
incurred at the partnership level, the taxpayer
purports to have a basis in the partnership interest
equal to the cost of the purchased call options
($1,000X in this example), even though the taxpayer's
net economic outlay to acquire the partnership interest
and the value of the partnership interest are nominal
or zero.  On the disposition of the partnership
interest, the taxpayer claims a tax loss ($1,000X in
this example), even though the taxpayer has incurred no
corresponding economic loss.  [Id., 2000-2 C.B. at
255.]

In the notice the IRS concluded that tax losses from these

transactions, and any other similar arrangements, were not

allowable as deductions for Federal income tax purposes.  Id.

The notice also stated that transactions that are the same as or

substantially similar to the one described above may be subject

to challenge under section 752, section 1.701-2, Income Tax

Regs., or other antiabuse rules, and could result in the section

6662 accuracy-related penalty.  Id., 2000-2 C.B. at 255-256.

There was no difference in essence between the MLD contracts and

the options described in the notice because the deposit and fixed

yield provisions of the MLD contracts were identical.  Those

identical provisions apart, what remains of the set of MLD contracts is a pair of options, similar to the ones addressed by the notice.

We conclude that, at the time petitioner filed Palm Canyon's return, petitioner did not have substantial authority for its tax treatment of the MLD transaction. Consequently, we need not decide whether petitioner reasonably believed that the tax treatment of the MLD transaction was more likely than not proper. We sustain respondent's alternative determination that the substantial understatement penalty is appropriate.

E.    Section 6664(c) Reasonable Cause Exception

The accuracy-related penalty imposed under section 6662 does not apply with respect to any portion of an underpayment as to which the taxpayer can demonstrate reasonable cause and good faith. Sec. 6664(c). Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. at 98. The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is generally the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Id. Circumstances that may indicate reasonable cause and good faith

include an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer. Id.

A taxpayer may demonstrate reasonable cause through reliance on the advice of a professional tax adviser as to the proper treatment of an item. Id.; see also Neonatology Associates, P.A. v. Commissioner, supra at 98. The taxpayer must demonstrate that reliance on professional advice was reasonable and that the taxpayer acted in good faith. Sec. 1.6664-4(b)(1), Income Tax Regs. All facts and circumstances will be considered in determining whether a taxpayer has reasonably relied in good faith on professional tax advice as to the treatment of the plan or arrangement under Federal tax law. Sec. 1.6664-4(c)(1), Income Tax Regs. The professional advice must be based upon all pertinent facts and circumstances and the law as it relates to those facts and circumstances. Sec. 1.6664-4(c)(1)(i), Income Tax Regs. The advice must consider the taxpayer's purposes for entering a transaction and for structuring a transaction in a particular manner. Id. The advice cannot be based on unreasonable factual or legal assumptions and cannot unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person. Sec. 1.6664-4(c)(1)(ii), Income Tax Regs. Reliance may be unreasonable when it is placed on insiders, promoters, or their offering materials, or when the

person relied on has an inherent conflict of interest that the taxpayer knew about or should have known about.  See Hansen v. Commissioner, 471 F.3d at 1031; Neonatology Associates, P.A. v. Commissioner, supra at 98.  Petitioner bears the burden of proving reasonable cause.  See Higbee v. Commissioner, 116 T.C. at 446.

Petitioner argues that Palm Canyon had reasonable cause for the reporting position it claimed on its return.  Petitioner contends that Mr. Hamel, who was not sophisticated in tax matters, reasonably relied on his team of advisers in proceeding with the MLD transaction.  Petitioner claims that Mr. Hamel employed Mr. Lamb to investigate the parties involved and Mr. Barish to review the tax aspects of the MLD transaction.  According to petitioner, Mr. Lamb and Mr. Barish both reviewed the Pryor Cashman opinion and advised Mr. Hamel to proceed with the tax reporting of the MLD strategy on the basis of the opinion's conclusion that Palm Canyon's tax treatment of the MLD transaction would more likely than not be respected.

In assessing whether Palm Canyon had reasonable cause, we examine AHI's role in the MLD transaction as Palm Canyon's managing member and TMP.  Specifically, we focus on the conduct of Mr. Hamel, petitioner's sole owner and an AHI director, and Mr. Lamb, who also was an AHI director and its treasurer/CFO.

Petitioner has not shown that AHI, as Palm Canyon's managing member, exercised ordinary business care and prudence in the tax treatment of the MLD transaction. Mr. Hamel played virtually no role in analyzing the tax aspects of the MLD transaction, electing instead to delegate this responsibility to Mr. Lamb and Mr. Barish. Neither Mr. Barish nor Mr. Lamb, as AHI's treasurer/CFO, conducted a proper investigation of the MLD transaction, despite their recognition that the MLD strategy was a tax avoidance scheme. Neither Mr. Barish nor Mr. Lamb provided an opinion with respect to the MLD transaction. Instead, they relied on opinions from Bryan Cave and Pryor Cashman.

Any reliance on the Pryor Cashman opinion was misplaced because Pryor Cashman was part of Cantley & Sedacca's promoter team and had a conflict of interest. In addition, Palm Canyon could not rely on the Pryor Cashman opinion because Mr. Hamel failed to provide signed representations, which were an express condition of reliance. Lastly, Palm Canyon could not rely on the Pryor Cashman opinion because Palm Canyon and its advisers did not provide Pryor Cashman with necessary facts that would have affected Pryor Cashman's conclusions. Sec. 1.6664-4(c)(1)(i), Income Tax Regs. Significantly, Pryor Cashman did not receive documents pertaining to the termination of CF Advisors as a member of Palm Canyon or the early termination of the MLD contracts nor did it receive information that might have led an

independent professional adviser to conclude that the various steps of the MLD transaction were predetermined. Any reliance on the Bryan Cave opinion was improper because it was not prepared for Palm Canyon and did not necessarily focus on facts peculiar to it.

Accordingly, we reject petitioner's contention that Palm Canyon had reasonable cause and acted in good faith with respect to its tax treatment of the MLD transaction, and we sustain the section 6662 accuracy-related penalty determined by respondent.

VI. Conclusion

We sustain respondent's adjustments to Palm Canyon's return. We find that the MLD transaction lacked economic substance and thus hold that it should not be respected for Federal income tax purposes.

We further sustain respondent's determination as to the section 6662 accuracy-related penalty. Petitioner failed to establish that there was no gross valuation misstatement within the meaning of section 6662(h). Alternatively, petitioner failed to prove that Palm Canyon was not negligent within the meaning of section 6662(b)(1) and that the penalty for substantial understatement of income tax under section 6662(b)(2) should not apply. Petitioner failed to establish that Palm Canyon had reasonable cause under section 6664(c).

We have considered all the other arguments made by petitioner, and to the extent not discussed above, we conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.